[Nos. D005468, D006265, D006231. Fourth Dist., Div. One. Apr. 26, 1989.]

H. S. PERLIN COMPANY, INC., et al., Plaintiffs and Appellants,
v.
MORSE SIGNAL DEVICES OF SAN DIEGO et al., Defendants and Repondents.

[Opinion certified for partial publication.*]

* Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of section I, subsections C through G, and section II.

COUNSEL

Roland B. Day and Rand, Day & Ziman for Plaintiffs and Appellants.

Stephen D. Marks, Joel P. Schiff, Joshua L. Rosen, Shea & Gould, Virginia R. Gilson, Gilson & Heaton, Peter L. Dean and McInnis, Fitzgerald, Rees, Sharkey & McIntyre for Defendants and Respondents.

## OPINION

BENKE, J.—In these consolidated appeals, the owner of a stamp and coin store and its consignors appeal from a judgment awarding the store owner $250 as the liquidated damages caused by the negligence of an alarm company. Because we find the disputed liquidated damage clause is enforceable, we affirm the judgment.

### FACTUAL SUMMARY

On or about December 4, 1974, plaintiff H. S. Perlin, Inc. (Perlin), and defendant Morse Signal Devices of San Diego (Morse) entered into a written contract under which Morse agreed to provide burglar and fire alarm service to Perlin's coin and stamp store. The terms of the contract are set forth in a two-page printed form provided by Morse to its customers. The first page of the contract has a number of blank spaces in which the equipment Morse agreed to install at Perlin's store is described in longhand. The $50 per month fee Perlin was required to pay Morse is also set forth in longhand on the first page. Herbert S. Perlin signed the contract on behalf of the corporation. Paragraph 4 of the contract is on the first page of the contract inmediately above the signature lines. Paragraph 4 is printed in bold type with red underlining and states: "(4) MORSE'S LIABILITY. Morse *does not* represent or warrant that the alarm system may not be compromised or circumvented; that the system will prevent any loss by burglary, hold-up, fire or otherwise; or that the system will in all cases provide the protection for which it is installed or intended. Subscriber acknowledges that Morse is not an insurer, that Subscriber assumes all risk of loss or damage to Subscriber's premises or to its contents; that Morse has made no representation or warranties, nor has Subscriber relied on any representations or warranties, express or implied, except as set forth herein and Subscriber acknowledges that he has read and understands, particularly *paragraphs 18 and 19* of this agreement which set forth Morse's obligation and maximum liability in the event of any loss of damage to Subscriber."

Paragraphs 18 and 19 are on the second page of the contract. Paragraph 19 provides: "(19) MORSE NOT AN INSURER AND LIQUIDATED DAMAGES. It is understood and agreed by and between the parties hereto that Morse is not an Insurer. Insurance, if any, will be obtained by the Subscriber. Charges are based solely upon the value of the services provided for, and are unrelated to the value of the Subscriber's property or the property of others located in Subscriber's premises. The amounts payable by the Subscriber are not sufficient to warrant Morse assuming any risk of consequential or other damages to the Subscriber due to Morse's negligence or failure to perform. The Subscriber does not desire this contract to provide for the liability of Morse and Subscriber agrees that Morse shall not be liable for loss or damage due directly or indirectly to any occurrence or consequences therefrom, which the service is designed to detect or avert. From the nature of the services to be performed, it is impractical and extremely difficult to fix the actual damages, if any, which may proximately result from the failure on the part of Morse to perform any of its obligations hereunder, or the failure of the system to properly operate with the resulting loss to the Subscriber. If Morse should be found liable for loss or damage due to a failure on the part of Morse or its system, in any respect, its liability shall be limited to the refund to Subscriber of an amount equal to the aggregate of six (6) monthly payments, or to the sum of Two Hundred Fifty ($250.00) Dollars, whichever sum shall be less, as liquidated damages and not as a penalty, and this liability shall be exclusive. The provisions of this paragraph shall apply in the event loss or damage, irrespective of cause or origin, results directly or indirectly to person or property from the performance or non-performance of the obligations set forth by the terms of this contract, or from negligence, active or otherwise, o f Morse, its agents or employees."

By its terms the alarm contract was automatically renewed on December 4, 1979, for a period of five years.

Sometime during the evening of August 25, 1980, a burglary occurred at Perlin's coin and stamp store. According to the Perlins the burglar(s) stole coins and stamps with a wholesale value of $958,000. Approximately $200,000 of the stolen property was being held by Perlin on consignment from customers.

Before entering the store the burglars cut a telephone line which ran from the burglar alarm system in Perlin's store to Morse's central station. When the line was cut, a signal indicating that an interruption in service had occurred was received at the Morse station. Upon receiving the signal a Morse employee contacted Pacific Telephone & Telegraph Company (Pacific Telephone) and asked it to identify which of a number of Morse

clients had experienced the interruption. The telephone company promptly reported to Morse the interruption had occurred at Perlin's store. Inexplicably, after receiving the telephone company's report no one at Morse took any further steps to protect the store or its contents.

Perlin carried no insurance which covered the losses sustained in the burglary.

## PROCEEDINGS BELOW

On April 28, 1981, Perlin, its four shareholders, Herbert Perlin, Gertrude Perlin, Joel Perlin and Robyn Perlin and twelve of its consignors filed a complaint against Morse, three Morse employees and Pacific Telephone. Eventually the Perlin complaint was amended to include as defendants Berlin Enterprises, Inc., the owner of Morse, and Robert Berlin, the general manager of Morse at the time of the burglary.

In its final pleading, the plaintiffs alleged Morse was liable for negligently monitoring the alarm system and failing to give any warning to the Perlins on the night of the burglary, failing to investigate Pacific Telephone's response to its request for information, breach of contract, fraud in inducing Perlin to enter into the 1974 contract, fraud following execution of the agreement, rescission of the 1974 contract and the 1979 renewal, and intentional and negligent spoliation of evidence.

In one of its four amended complaints, the Perlins also alleged Morse was liable for failing to apprise the Perlins of the availability of a more advanced security system. Morse demurred to that cause of action and its demurrer was sustained without leave to amend.

Trial commenced on the plaintiffs' remaining causes of action on April 1, 1986. The case was tried without a jury and all parties stipulated to dismissal of Pacific Telephone from the case. By virtue of a previous order of the superior court, the defendants' liability was heard prior to trial of plaintiffs' damages.

On April 22, 1986, following the close of evidence and argument on the liability issues, the trial judge issued a tentative ruling in which he found Morse's negligence caused the losses the plaintiffs experienced in the burglary. Nonetheless the trial court found Perlin's damages were limited to $250 by the provisions of paragraph 19 of the 1974 agreement. The trial court further found Morse did not owe any of the remaining plaintiffs a duty of care.

Following the plaintiffs' request, the court entered a statement of decision. On August 6, 1986, a judgment conforming with the statement of decision was also entered.

The plaintiffs' motion for a new trial was denied on October 10, 1986, and they filed a timely notice of appeal from the August 6, 1986, judgment.

On April 7, 1987, the trial judge awarded attorney fees to Morse, Robert Berlin, Berlin Enterprises and two of Morse's employees. Plaintiffs and defendants appealed from the orders granting attorney fees and this court consolidated those appeals with plaintiffs' appeal from the underlying judgment.

## DISCUSSION

## I

### *Appeal From the Judgment*

On appeal Perlin, its shareholders and its consignors argue paragraph 19 of the Morse contract is not enforceable because it does not meet the requirements of Civil Code[2] section 1671, which governs liquidated damage clauses. Alternatively they argue paragraph 19 is unconscionable. They also assert paragraph 19 is defective because it merely limits damages rather than liquidates them.

The Perlins argue that even if paragraph 19 is enforceable, the trial court nonetheless erred in denying them relief on their claims for fraud, rescission and spoliation of evidence. In addition the consignors argue paragraph 19 cannot limit their claims because they were not parties to the Morse contract.

The Perlins also ask us to review the trial court's earlier order dismissing without leave their claim that Morse should have kept them apprised of advances in security systems.

Finally plaintiffs believe the court erred in failing to give them judgment against Berlin Enterprises and some of the individual defendants and in failing to make findings with respect to the individuals.

We find no merit in any of these arguments and affirm the judgment.

---

[2] All statutory references are to the Civil Code unless otherwise specified.

A.  Civil Code Section 1671

█  Prior to July 1, 1978, section 1671 provided: "The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix actual damage."[3]

In *Better Food Mkts.* v. *Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179 [253 P.2d 10, 42 A.L.R.2d 580], our Supreme Court found a liquidated damage provision in a burglar alarm contract met the requirements of this version of section 1671 as a matter of law. The contract in *Better Food Mkts.* was in most respects similar to the one in Morse's contract.[4] In addition there, as here, an alarm company failed to promptly react to a signal which indicated that some manner of theft was taking place at a subscriber's place of business. (*Id.* at pp. 182-183.) The Supreme Court, following the holdings in earlier cases, acknowledged that under the then current version of section 1671 the party seeking to enforce a liquidated damage clause bore the burden of pleading and proving impracticability. (*Id.* at p. 185.) Nonetheless the court went on to find: "There being no reasonable basis upon which to predict the nature and extent of any loss, or how much of that loss the defendant's failure of performance might account for, *it is certain that it would have been 'impracticable or extremely difficult to fix the actual damage.'* (Civ. Code, § 1671).

"The validity of a clause for liquidated damages requires that the parties to the contract 'agree therein upon an amount which shall be presumed to be the amount of damages sustained by a breach thereof . . .' [Citation.] This amount must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained. [Citations.] . . . . The plaintiff's contention that the agreed amount did not represent an endeavor by the parties to estimate the probable damage is based on evidence that the liquidation clause was part of the printed material in a form contract generally used by the defendant in dealing with subscribers such as the plaintiff, and that the defendant did not

---

[3] Prior to July 1, 1978, section 1671 was preceded by a version of section 1670 which stated: "Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section."

[4] In *Better Food Mkts.* the contract provided: " 'It is agreed by and between the parties that the Contractor is not an insurer, that the payments hereinbefore named are based solely on the value of the service in the maintenance of the system described, that it is impracticable and extremely difficult to fix the actual damages, if any, which may proximately result from a failure to perform such services and in case of failure to perform such services and a resulting loss its liability hereunder shall be limited to and fixed at the sum of fifty dollars as liquidated damages, and not as a penalty, and this liability shall be exclusive.' " (40 Cal.2d at p. 184.)

investigate the plaintiff's manner of conducting its business or the character and value of its stock. Nevertheless the parties agreed to the liquidation provisions, and there is no evidence that they were not fully aware of circumstances making it desirable that liquidated damages be provided for." (*Id.* at pp. 186-187, italics added.)

The holding in *Better Food Mkts.* was followed and similar liquidated damage provisions in alarm contracts were upheld in *Atkinson* v. *Pacific Fire Extinguisher Co.* (1953) 40 Cal.2d 192 [253 P.2d 18]; *Zurich Ins. Co.* v. *Kings Industries, Inc.* (1967) 255 Cal.App.2d 919 [63 Cal.Rptr. 585]; *Feary* v. *Aaron Burglar Alarm, Inc.* (1973) 32 Cal.App.3d 553 [108 Cal.Rptr. 242]; and *Guthrie* v. *American Protection Industries* (1984) 160 Cal.App.3d 951 [206 Cal.Rptr. 834]. Indeed in *Atkinson,* although a fire alarm subscriber had received a verdict of $97,437, the Supreme Court, relying upon *Better Food Mkts.,* enforced a $25 liquidated damage clause on appeal. In commenting upon the effect of *Better Food Mkts.* the court in *Zurich Ins. Co.* said: "The California Supreme Court, however, confronted with facts strikingly similar to those herein related, where the effect of a clause differing in no material respects from the instant provision was disputed, held that not only did the provision in question constitute a good liquidated damages clause, but it was valid as a matter of law. (*Better Food Mkts., Inc.* v. *American Dist. Tel. Co., supra,* 40 Cal.2d 179, 184-187.) Although the defendant in that case received a directed verdict, and no specific findings were made, it was determined that the consequences of the defendant's potential failure to perform its agreement to protect certain grocery store premises were so innumerable that it would have been 'impracticable or extremely difficult to fix the actual damage' (Civ. Code, § 1671) as a matter of law. [Citation.] On similar and undisputed facts, we are bound by this conclusion." (255 Cal.App.2d at p. 924.)

However the rationale used in *Better Food Mkts.* and *Atkinson* was not free of criticism. (See *Fireman's Fund Ins. Co.* v. *Morse Signal Devices* (1984) 151 Cal.App.3d 681, 689 [198 Cal.Rptr. 756]; Note, *Damages—Liquidated Damages and Penalties* (1954) 27 So.Cal.L.Rev. 209; Sweet, *Liquidated Damages in California* (1972) 60 Cal.L.Rev. 84, 109; Comment, *Probability Versus Possibility in Liquidated-Damages Clauses* (1953) 5 Stan.L.Rev. 832; Comment, *Liquidated Damages and the "No Harm Rule"* (1957) 9 Stan.L.Rev. 381, 382.) In particular, commentators noted that although the defendants in both cases had used preprinted forms, the court nonetheless found the parties had in fact engaged in a reasonable endeavor to estimate fair compensation. (See 1 Witkin, Summary of Cal. Law (7th ed. 1960) § 174, 190-191.) The commentators also noted that in both cases the clauses were, in effect, limitations on the defendants' liability, rather than

the usual liquidated damage provisions, which assures claimants recovery of a substantial amount. (*Ibid.*)

While the reasoning employed in *Better Food Mkts.* and *Atkinson* has been questioned, the results reached in those cases has been consistently accepted. Indeed in a study prepared for the Law Revision Commission, one commentator endorsed *Better Food Mkts.* on substantive grounds which the court's opinion did not directly address: "This was a proper decision. The burglar alarm system may have involved use of new scientific techniques that, along with human error, could expose the burglar alarm company to high risks. That they thought they had transferred this risk to the user is shown by the clause, the language that the company was not an insurer, and the $15 a month charge. If they could not contract away this risk, they would have to insure; and since it is likely that the user would also insure, this would probably result in overinsurance. Such a clause should be enforced in a high-risk, low-compensation service when enforcement is what the parties expected." (Sweet, *op.cit. supra,* 60 Cal. L.Rev. 84, 115; 11 Cal. Law Revision Com. Rep. (1973) 1262.)[5]

Thereafter, in its report to the Legislature recommending amendments to sections 1670 and 1671, the Law Revision Commission itself cited *Better Food Mkts.* for the proposition that a limitation on liability is acceptable where the beneficiary of the limitation is engaged in a high-risk enterprise. (13 Cal. Law Revision Com. Rep. (1976) pp. 1737, 1741.)

In 1977 the Legislature adopted the commission's recommendations without change. (Stats. 1977, ch. 198, § 5.) In particular the Legislature repealed section 1670 and amended section 1671 to read in pertinent part: "(a) This section does not apply in any case where another statute expressly applicable to the contract prescribes the rules or standard for determining the validity of a provision in the contract liquidating the damages for the breach of the contract.

"(b) Except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."[6]

---

[5] In general the study concluded that sections 1670 and 1671 did not adequately state the law with respect to liquidated damages and that amendments to those sections which would allow contracting parties more leeway to determine damages were needed. (11 Cal. Law Revision Com. Rep., *supra,* at pp. 1289-1290.) The study also recommended that where the parties do not have equal bargaining power, liquidation clauses should receive careful judicial scrutiny. (*Id.* at p. 1291.)

[6] The remainder of section 1671 provides: "(c) The validity of a liquidated damages provision shall be determined under subdivision (d) and not under subdivision (b) where the liqui-

The Law Revision Commission comment to the 1977 amendments to section 1671 described the effect of the amendments in the following terms: "Section 1671 is amended to provide in subdivision (b) *a new general rule favoring the enforcement of liquidated damages provisions* except against a consumer in a consumer case. In a consumer case, the prior law under former Sections 1670 and 1671, continued in subdivision (d) still applies." (Italics added.)

In our view the foregoing prevents the Perlins from arguing the Morse contract is invalid under section 1671. The language of paragraph 19 is in all material respects indistinguishable from the language approved as a matter of law in *Better Food Mkts.* Here, as in *Better Food Mkts.,* the compensation provided to the alarm company was nominal in relation to the company's potential liability. Thus, were we to apply the law as it existed prior to the 1977 amendments on the grounds the contract was entered into in 1974, we would be bound by *Better Food Mkts.* to uphold paragraph 19 of the Morse contract as a matter of law. (See *Zurich Ins. Co.* v. *Kings Industries, Inc., supra,* 255 Cal.App.2d at p. 924.)

The Perlins would fare no better were we to adopt their suggestion that, in light of the 1979 renewal, the contract should be governed by the amended version of section 1671. (See *Fireman's Fund Ins. Co.* v. *Morse Signal Devices, supra,* 151 Cal.App.3d at p. 690, fn. 1.) As the history of the statute suggests, the 1977 amendments were designed to favor enforcement of liquidated damage clauses by shifting the burden of proof to parties who wish to invalidate liquidation provisions. Significantly, in developing a new statutory scheme the drafters of the amendments accepted, as reasonable in the alarm service industry, the risk allocation mechanism approved in *Better Food Mkts.* (13 Cal. Law Revision Com. Rep., *supra,* p. 1741.) More importantly, in an effort to give consumers protection unavailable in a commercial setting, the Legislature repeated, in subdivision (d) of the new statute, the very standard which had given rise to the holding in *Better Food Mkts.* These circumstances suggest the 1977 amendments do not sanction any greater interference in alarm service contracts than is permitted under *Better Food Mkts.* Rather, the Legislature's continuing reliance upon the very language interpreted in *Better Food Mkts.* suggests the risk allocation

---

dated damages are sought to be recovered from either: [¶] (1) A party to a contract for the retail purchase, or rental, by such party of personal property or services, primarily for the party's personal, family, or household purposes; or [¶](2) A party to a lease of real property for use as a dwelling by the party or those dependent upon the party for support. [¶](d) In the cases described in subdivision (c), a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

scheme upheld in *Better Food Mkts.* and its progeny meets the procedural and substantive requirements of section 1671, subdivision (b). Thus, since paragraph 19 is indistinguishable from the liquidated damage provision approved in *Better Food Mkts.,* we could easily conclude the Morse contract meets the requirements of section 1671, subdivision (b), as a matter of law.

■ However, even if we dispense with our reservations and indulge Perlin's argument that *Better Food Mkts.* has no application to alarm service contracts entered into after 1978, we cannot disturb the trial court's decision to enforce paragraph 19. The procedural and substantive defects asserted by Perlin are flatly contradicted by the record, including the trial court's detailed findings.[7] For instance, although we agree with Perlin's argument the preprinted liquidation clause did not present a realistic opportunity to negotiate over that term of the contract, that inequality in bargaining strength did not itself make paragraph 19 unreasonable. As the court in *Kurashige* v. *Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606, 614 [246 Cal.Rptr. 310], stated: "The meaningfulness of a party's choice is based not only on his relationship to the other party but also on his ability to obtain the goods or services which are the subject of the parties' contract from others. [Citation.]" Here the record discloses that insurance against the theft risks Morse was unwilling to assume was nonetheless available to the Perlins and that they made a business decision to forego that means of protection.

Moreover the record rebuts the Perlins' claim they were unfairly surprised by paragraph 19. As the trial judge noted in his statement of decision, "[p]aragraph 4 of said contract, appearing just above the signature lines, calls attention to the liquidated damages clause on the second page of the contract and is set forth in bold print with certain red underlining setting forth MORSE'S obligations/liability and drawing attention to the liquidated damages clause contained in paragraph 19 on the second page." The trial judge also noted Herbert S. Perlin, who signed the contract on behalf of Perlin, testified he "had . . . a custom and practice of not reading any contracts of any kind at all, which practice has existed all of his adult life." The record also discloses that although the Morse salesman who obtained the Perlin account had no specific recollection that he had discussed the liquidated damage provision with the Perlins, his usual practice was to point out the liquidated damage clause to subscribers. We also note all the contracts presented to the Perlins by their previous alarm service, San Diego Alarm Company, contain liquidated damage provisions remark-

---

[7] Accordingly, what we said in *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 481 [186 Cal.Rptr. 114, 38 A.L.R.4th 1], bears repeating: "We wish to stress the factual nature of the issues substantially limits our appellate role. Where the resolution of several key legal issues turns largely on inferences drawn from the facts presented, we are hesitant to interfere with the sound judgment of the trial court."

ably similar to Morse's agreement. In light of this evidence, we cannot quarrel with the trial court's conclusion paragraph 19 was enforceable even though the Perlins did not read or understand it. (See *Zurich Ins. Co.* v. *Kings Industries, Inc., supra,* 255 Cal.App.2d at pp. 924-925.)

The record also forecloses Perlin's attack on the substantive reasonableness of paragraph 19. The trial court found the Perlins were aware the initial $300 payment and $50 a month service charge paid to Morse were far less than the insurance premium required to protect the value of their inventory in the event of theft. The trial court's finding is supported by testimony from Joel Perlin who stated that it would have cost $25,000 a year to insure $500,000 of inventory. In light of the relatively small compensation Morse received, Perlin cannot demonstrate the limitations imposed by paragraph 19 reallocated the potentially high risks of the parties' bargain in an objectively unreasonable or unexpected manner. (See *A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d at p. 487; Sweet, *supra,* 60 Cal.L.Rev. at p. 115.)

Finally, we note that although paragraph 19, like the other alarm service contracts which have been subject to judicial review, may limit a subscriber's damages rather than predict them, that fact does not take the contract outside either version of section 1671. (See *Atkinson* v. *Pacific Fire Extinguisher Co., supra,* 40 Cal.2d at p. 193; 13 Cal. Law Revision Com. Rep., *supra,* at pp. 1740-1741.)

B.   Unconscionability

█   The Perlins also argue the liquidation provisions of the Morse contract are unconscionable. As this court explained in *A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d at page 484: "Unconscionability has long been recognized as a common law doctrine which has been consistently applied by California courts in the absence of specific statutory authorization. [Citations.] And although the Legislature did not adopt section 2-302 as part of California's version of the Uniform Commercial Code [citations], the identical language, complete with accompanying commentary, was recently enacted as section 1670.5 of the Civil Code."[8]

Unlike section 1671, the doctrine of unconscionability is not limited to particular types of contracts or to particular provisions of contracts. It applies to *all* provisions of *all* contracts. (See *A & M Produce Co.* v. *FMC*

---

[8] Section 1670.5 provides in part: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

*Corp., supra,* 135 Cal.App.3d at p. 485.) In setting the standards by which to apply the doctrine we said: "[U]nconscionability has both a 'procedural' and a 'substantive' element. [Citations.]

"The procedural element focuses on two factors: 'oppression' and 'surprise.' [Citations.] 'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' [Citations.] 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms. [Citations.] Characteristically, the form contract is drafted by the party with the superior bargaining position. [Citation.]

"Of course the mere fact that a contract term is not read or understood by the nondrafting party or that the drafting party occupies a superior bargaining position will not authorize a court to refuse to enforce the contract. Although an argument can be made that contract terms not actively negotiated between the parties fall outside the 'circle of assent' which constitutes the actual agreement [citation], commercial practicalities dictate that unbargained-for terms only be denied enforcement where they are also *substantively* unreasonable. [Citations.] No precise definition of substantive unconscionability can be proffered. Cases have talked in terms of 'overly harsh' or 'one-sided' results. [Citations.] One commentator has pointed out, however, that ' . . . unconscionability turns not only on a "one-sided" result, but also on an absence of "justification" for it' [citation] . . . . The most detailed and specific commentaries observe that a contract is largely an allocation of risks between the parties, and therefore that a contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner. [Citations.] But not all unreasonable risk reallocations are unconscionable; rather, enforceability of the clause is tied to the procedural aspects of unconscionability [citation] such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated. [Citation.]" (135 Cal.App.3d at pp. 486-487.)

In our view the reasonableness standard set forth in section 1671, subdivision (b), while giving contracting parties greater freedom than they enjoyed under prior law, nonetheless provides for more judicial scrutiny than is allowed under the unconscionability standards we articulated in *A & M Produce Co.* Indeed the comments to the 1977 amendments suggest that, unlike the doctrine of unconscionability, an unreasonable risk allocation alone may invalidate a liquidated damages clause. (Com. to 1977 amend. to

§ 1671.)[9] Since, as we have seen, the Morse contract meets the requirements imposed by section 1671, the Perlins cannot make any claim the contract is nonetheless unconscionable.[10]

C.-G., II*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

The judgment is affirmed; the order appealed from is affirmed in part, corrected in part and reversed and remanded in part with instructions. Each party to bear its own costs on appeal.

Wiener, Acting P. J., concurred.

**HUFFMAN, J.**—I concur in the result based upon Perlin's intentional failure to read the provisions of the Morse contract.

A petition for a rehearing was denied May 15, 1989, and appellants' petition for review by the Supreme Court was denied July 12, 1989.

---

[9] "All the circumstances existing at the time of the making of the contract are considered, including the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract. Other relevant considerations in the determination of whether the amount of liquidated damages is so high or so low as to be unreasonable include, but are not limited to, such matters as the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract." (Com. to 1977 amend. to § 1671.)

[10] In this regard we note the societal interests articulated in section 1671 and the doctrine of unconscionability are quite similar. In explaining the regulation of liquidated damages Professor Sweet said: "The question of how much autonomy the law should give parties to employ clauses that control the amount of damages recoverable for contract breach is part of the general issue of party autonomy. . . .

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Largely because of adhesion contracts, the past 20 years have seen a proliferation of legal controls on contracts. There is more judicial intervention through the back door of interpretation and, increasingly now, direct intervention through refusal to enforce contracts that courts think are unjust. There is also more control of standardized contracts by state and federal regulatory agencies; section 2-302 of the Uniform Commercial Code directly invites courts to police the worst aspects of all standardized sales contracts and a proliferation of legislation controls contracts and contract making in particular situations." (Sweet, *supra*, 60 Cal.L.Rev. at pp. 85-86, fns. omitted.)

We reiterated these concerns in our discussion of unconscionability: "[T]he social benefits associated with freedom of contract are severely skewed where it appears that had the party actually been aware of the term to which he 'agreed' or had he any real choice in the matter, he would never have assented to inclusion of the term." (*A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d at p. 490).

*See footnote, *ante*, page 1289.