[No. E008238. Fourth Dist., Div. Two. Feb. 11, 1991.]

MARKBOROUGH CALIFORNIA, INC., Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
J. HARLAN GLENN & ASSOCIATES, Real Party in Interest.

COUNSEL

Snell & Wilmer, Steven T. Graham and Richard A. Derevan for Petitioner.

No appearance for Respondent.

Collins, Collins, Muir & Traver, Samuel J. Muir and Brian K. Stewart for Real Party in Interest.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, James E. Chodzko, Robert J. Gaglione, Bronson, Bronson & McKinnon, Paul J. Sanner, Jose H. Garcia, Anne M. Lawlor, Goyette, Severson & Werson, Jan T. Chilton, John W. Bergholt and Michael B. Murphy as Amici Curiae on behalf on Real Party in Interest.

## OPINION

**HOLLENHORST, Acting P. J.**—In this case we hold that a provision in a construction contract limiting a party's liability to the developer of the property for damages caused by the engineer's professional errors and omissions is valid under Civil Code section 2782.5[1] if the parties had an opportunity to accept, reject or modify the provision.

Petitioner (hereinafter referred to as Markborough) filed a petition for writ of mandate seeking to vacate respondent court's order granting summary adjudication of issues in favor of real party in interest (hereinafter referred to as Glenn). We issued an alternative writ and now deny a peremptory writ. As we explain, we find the respondent court properly determined that the limitation of liability clause in the contract between Markborough and Glenn is valid and that Glenn's liability to Markborough is limited to the amount of $67,640.

### FACTS

In 1981, Markborough entered into a contract with Glenn wherein Glenn agreed to design a manmade lake to be constructed as part of Markborough's planned community known as "Sunnymead Ranch." In February of 1986, the lake liner failed. Markborough incurred over $5 million in expenses to remedy the problem. In August of 1988, Markborough filed the underlying action against Glenn for breach of contract to recover for the damages Markborough incurred as a result of the failure of the lake liner.[2]

---

[1] Unless otherwise indicated, all statutory references are to the Civil Code.

[2] Other defendants were also named in the action but they are not parties to the present petition proceeding.

Glenn brought a motion for summary adjudication of issues seeking a determination that the contract between Markborough and Glenn contained a liability limitation, limiting Glenn's exposure to claims for professional negligent acts, errors and omissions in the amount of $67,640. In its separate statement of undisputed facts, Glenn states that it is an engineering firm specializing in the design of manmade lakes; that Markborough is a subsidiary of Markborough Properties, Ltd. of Toronto, Canada which is the real estate development arm of Hudson Bay Company; that a contract as described above was entered into between the parties which contained a limitation of liability clause limiting Glenn's liability to the greater of $50,000 or Glenn's consulting fee; that Glenn was paid $67,640 for its services and that Markborough filed the present action to recover against Glenn, alleging negligent design. In response, Markborough essentially admitted these facts.[3] However, Markborough contended that for the clause to be valid under section 2782.5 the liability limitation clause had to have been specifically negotiated and expressly agreed to by the parties. It alleged that there were other triable issues of facts regarding the elements of negotiation and express agreement which precluded the grant of summary adjudication. Markborough alleged in essence that Glenn did not have any discussions with Markborough regarding the liability limitation clause, that the clause is paragraph 28 out of 38 paragraphs contained in fine print on the reverse side of the standard form of agreement between client and consultant, that Glenn never discussed the potential liability or costs associated with a complete failure of the lake system, that Glenn had superior knowledge of the risks associated with the lake system and the potential repair costs, that the failure of the lake liner, which according to Glenn was caused by a "severe differential settlement of the subsoils," cost over $5 million to repair. Markborough relied on J. Harlan Glenn's deposition as evidence that the limitation of liability clause was never discussed and that Glenn never disclosed the risks involved in the lake system. Glenn did not dispute these additional facts.

The court granted the motion for summary adjudication, finding that the liability limitation clause was valid and that therefore Glenn's liability to Markborough was limited to $67,640. This petition followed.

## Discussion

■ This case appears to present an issue of first impression regarding the meaning of the phrase "negotiating and expressly agreeing" found in section 2782.5. That section provides that "[n]othing contained in Section

---

[3] Markborough denied the amount of money paid Glenn but presented no contrary evidence.

2782 shall prevent a party to a construction contract and the owner or other party for whose account the construction contract is being performed from negotiating and expressly agreeing with respect to the allocation, release, liquidation, exclusion, or limitation as between the parties of any liability (a) for design defects, or (b) of the promisee to the promisor arising out of or relating to the construction contract."[4] Section 2782 as written at the time the contract in this case was executed provided that *all* provisions which purport to indemnify the promisee against liability for damages for death or bodily injury, property damage or any other loss arising from the sole negligence of the promisee or for defects in design furnished by the promisee are against public policy and are void and unenforceable.[5]

Markborough contends that because section 2782.5 is an exception to section 2782, the phrase "negotiating and expressly agreeing" must be narrowly construed and should be interpreted to require the party seeking to enforce an exculpatory clause to demonstrate that the provision was discussed orally by the parties after the party had made full disclosure of the risks involved in the construction project. Glenn contends that Markborough's interpretation is too narrow and that all that should be required to find a valid limitation of liability clause is that the parties were of equal bargaining power and were engaged in an arm's length transaction. Amicus curiae Woodward-Clyde Consultants argues that all section 2782.5 requires is that the parties had the opportunity to negotiate with respect to the provision.

The language of the statute provides no guidance on the proper interpretation of the phrase. Similarly, the legislative materials provided by the various parties, of which we take judicial notice, contain no specific discussion of the phrase and its meaning. Without any express guidance from the Legislature regarding the meaning of "negotiating and expressly agreeing," we must attempt to divine its meaning from the history of section 2782.5 and the various legislative materials provided. This task entails to a limited extent a review of the history of section 2782 as well.

In 1967 the Legislature added sections 2782 and 2782.5. Section 2782 declared that an agreement in a construction contract which purports to indemnify a promisee for loss occasioned by the promisee's sole negligence or willful misconduct is against public policy and is void and unenforceable. ■ From the materials provided, it appears this section was added because

---

[4] "Construction contract" is defined broadly in section 2783 to include contracts related to design of improvements or developments to real or personal property. The parties agree that the contract at the heart of the dispute in this case is a "construction contract" within the meaning of section 2783.

[5] In 1985 the section was amended deleting the word "all" and adding in its place the phrase "[e]xcept as provided in Sections 2782.1, 2782.2, and 2782.5."

of the increasing use of hold-harmless agreements in construction contracts making the general contractors responsible for liabilities which are not normally theirs such as liability for latent defects in a building caused by negligence by the architect or engineer. (Sen. Judiciary Com. Hearing Rep., hearing date Apr. 27, 1967.) One of the concerns prompting the addition of section 2782 was the belief that if a party could be indemnified for his own wrongful act, he would have less incentive to use due care. (Rep. for Assem. Com. on Judiciary.) The CEB Review of Selected 1967 Code Legislation noted that the increasing use of these hold-harmless provisions, which "general contractors, finding themselves in an unequal bargaining position, have been unable to exclude" also led to increased insurance costs for general contractors.

At the same time section 2782 was added, the Legislature also added section 2782.5 which provided that "[n]othing contained in Section 2782 shall prevent a party to a construction contract and the owner or other party for whose account the construction contract is being performed, from agreeing with respect to the allocation or limitation as between the parties of any liability for design defects." Again, according to the Continuing Education of the Bar materials, "[t]his type of agreement, evidencing as it does a bargaining agreement and not mere economic coercion, is outside the scope of the § 2782 protection." Thus it appears that while section 2782 was intended to eliminate indemnity agreements which were being forced upon parties to construction contracts which require the promisor to indemnify a promisee from the promisee's sole negligence, section 2782.5 was intended to permit parties to continue to negotiate and limit their respective liability to each other.

In 1980, sections 2782 and 2782.5 were amended. Apparently, the purpose of the amendments was "to clarify the ability of the parties in construction contracts to negotiate agreements that apportion liability." (Sen. Com. on Judiciary Rep. on Sen. Bill No. 2000 as amended Apr. 17, 1980.) According to the Senate Judiciary Committee Report, Senate Bill No. 2000 which amended sections 2782 and 2782.5 was necessary to clarify that *all* provisions—not just hold harmless clauses—which purport to indemnify the promisee for the promisee's sole negligence are void and unenforceable and that all limitation of liability provisions including provisions which otherwise allocate, release, liquidate or exclude liability as between the parties for not only design defects but other liabilities as well are valid. The legislative bill file from the Senate Judiciary Committee also contains a document entitled "California Construction Contract Anti-Indemnity Statute History and Analysis" which states that the juxtaposition of sections 2782 and 2782.5 created uncertainty as to whether the invalidity rule of section 2782 applies to limitation of liability provisions. According to this

report, although limitation of liability provisions are not commonly considered to be indemnity provisions since liability to a third party is not involved, "the expansive definition of indemnity in Civil Code section 2772 could be contended to bring such agreements within the scope of section 2782 . . . . This possibility is heightened by section 2782.5 which, by permitting certain contractual limitations and exclusions ('design defects'), impliedly excludes others." The proposed amendment to section 2782.5 was intended to eliminate this uncertainty by confirming that allocation or limitation of liabilities between the owner and the contractor is valid. The Author's Statement for Senate Bill 2000, as amended May 6, 1980, also confirms that the purpose of the amendments to sections 2782 and 2782.5 was to allow the owner and contractor to enter into an arm's length transaction in which they expressly agree to an allocation of liability as between the parties.

Senate Bill No. 2000 as originally introduced provided that "[n]othing contained in Section 2782 shall prevent a party to a construction contract and the owner or ‚other party for whose account the construction contract is being performed, *where the contracting parties are of relatively equal bargaining strength and are dealing in a commercial setting,* from *negotiating and expressly* agreeing with respect to the allocation, *release, liquidation, exclusion,* or limitation as between the parties of any liability *(a)* for design defects, *or (b) of the promisee to the promisor arising out of or relating to the construction contract."* Thereafter, apparently in response to opposition from the Association of California Water Agencies dated April 1, 1980, the phrase " 'where the contracting parties are of relatively equal bargaining strength and are dealing in a commercial setting' " was deleted. The association opposed this language as being very subjective which would lead to endless litigation. Thus, the bill as passed provided in essence that nothing in section 2782 shall prevent the contractor and owner from *negotiating and expressly agreeing* with respect to an allocation or other limitation as between the parties of any liability.

From these materials, two points are apparent to us. First, the anti-indemnity statute, section 2782, was intended to *change* the law to prohibit one party to a construction contract from avoiding liability to third parties because of its sole negligence by forcing the other party to the contract to provide indemnification. Secondly, we believe section 2782.5 was not intended to change existing law but rather was intended merely to reaffirm and clarify that limitation of liability provisions remain valid notwithstanding section 2782.

■ With those points in mind, we reject Markborough's contention that the phrase "negotiating and expressly agreeing" imposes upon parties

such as Glenn the affirmative duty to specifically advise the other party of the inclusion of a liability limitation clause in the contract and to inform the other party of the risks involved in the project. Nothing in the legislative materials or in the purpose of the legislation as reflected in these materials indicates an intent to impose additional duties of disclosure. Had the Legislature intended to impose affirmative duties of disclosure, it could have utilized language similar to that found in numerous other statutes imposing such requirements. (See, e.g. §§ 1677, 1803.3.)[6] Accordingly we will not presume the Legislature intended to impose specific disclosure requirements merely from the use of the phrase "negotiating and expressly agreeing" when there is clearly more precise language which could have been utilized.

Having determined that "negotiating and expressly agreeing" did not obligate Glenn to specifically advise Markborough of the limitation of liability provisions or to specifically disclose the potential risks involved in the project itself, we must still determine what *was* intended by the phrase. Various rules of statutory construction exist to aid us in this task.

■ First, this court should look to the words chosen and unless they have a specific legal definition, we ordinarily give the words the meaning they have in ordinary usage. (*Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84, 91 [255 Cal.Rptr. 670, 767 P.2d 1148]; *Ceja* v. *J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1375 [242 Cal.Rptr. 531].) "The questioned provision must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature . . . ." (*People* ex rel. *Deukmejian* v. *CHE, Inc.* (1983) 150 Cal.App.3d 123, 132 [197 Cal.Rptr. 484].) Even if the words do not appear to be ambiguous, if the literal construction of the section would be inconsistent with the legislative intent, if possible the statute should be construed in a manner consistent with the intent. (*People* v. *Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485].) "[T]he intent of the Legislature is the end and aim of all statutory construction." (*Title Ins. & Trust Co.* v. *County of Riverside, supra*, 48 Cal.3d 84, 95.)

Webster's Third New International Dictionary (1964) page 1514, defines "negotiate" to mean "to communicate or confer with another so as to arrive at the settlement of some matter: meet with another so as to arrive through

---

[6]Section 1677 states that a provision for liquidated damages in a contract to purchase and sell real property is invalid unless "(a) [t]he provision is separately signed or initialed by each party to the contract; and [¶] (b) [i]f the provision is included in a printed contract, it is set out either in at least 10-point bold type or in contrasting red print in at least eight-point bold type." Section 1803.3, subdivision (c) contains detailed disclosures requirements for certain retail installment contracts.

discussion at some kind of agreement or compromise about something . . . ." Markborough argues that with this definition, a limitation of liability provision is not valid unless the parties actually discussed it. Accordingly, Markborough continues, since J. Harlan Glenn admitted in his deposition that there was never any discussion regarding the provision, it is invalid. Again we believe Markborough's interpretation is too narrow.

"Negotiate" also means "[t]o transact business; to bargain with another respecting a purchase and sale; to conduct communications or conferences with a view to reaching a settlement or agreement. It is that which passes between parties or their agents in the course of or incident to the making of a contract and is also conversation in arranging terms of contract . . . . [¶] To conclude by bargain, treaty, or agreement." (Black's Law Dict. (5th ed. 1979) p. 934.) Clearly this definition is much broader and does not attempt to define what acts or words constitute negotiation. Even Webster's also defines "negotiate" as meaning simply "to carry on business." In our view, the word "negotiate" has no precise definition and means nothing more than the process by which parties come to or do not come to an agreement. A negotiation can be as simple as the submission of an offer which is accepted without qualification or comment. The negotiation process, on the other hand, might be more complex and consist of numerous offers, counteroffers and modifications, discussions and other communications. Obviously, what constitutes "negotiation" in any one case cannot be fixed with any degree of specificity and we find no evidence that the Legislature intended any precise form of negotiation. Accordingly, all that reasonably can be required for "negotiation" is a fair opportunity for both parties to accept, reject or modify the other's offers or demands.

This definition of "negotiating"—i.e., all that is required is that the parties have a fair opportunity to accept, reject or modify a liability limitation provision—is consistent with the common law regarding such provisions as it existed both before and after enactment and amendment of section 2782.5.  ■  First, limitation of liability provisions have long been recognized as valid in California. (*Philippine Airlines, Inc.* v. *McDonnell Douglas Corp.* (1987) 189 Cal.App.3d 234, 237 [234 Cal.Rptr. 423]; see also, *Wheeler* v. *Oppenheimer* (1956) 140 Cal.App.2d 497, 499 [295 P.2d 128]: the "validity of [such clauses] is not open to doubt.") In other contexts, it has been recognized that limitation of liability provisions are particularly important where the beneficiary of the clause is involved in a "high-risk, low-compensation service." (*H. S. Perlin Co.* v. *Morse Signal Devices* (1989) 209 Cal.App.3d 1289, 1297 [258 Cal.Rptr. 1].)

Secondly, although these provisions generally have been upheld as reasonable and valid, nonetheless, because they do in fact exculpate or insulate

a party, at least to a certain extent, from liability for his or her own wrongful or negligent act, the law both before and after section 2782.5 was that such provisions may be declared unenforceable if the provision is unconscionable or otherwise contrary to public policy. (*Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 98-101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]; *H. S. Perlin Co.* v. *Morse Signal Devices, supra,* 209 Cal.App.3d 1289, 1300-1301.) One of the factors in determining whether a contract provision is against public policy is whether the provision is the result of an arm's length transaction between parties of relatively equal bargaining power. "As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence." (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 99-101, fns. omitted.) Similarly, a contract provision may be unconscionable if there is an " 'inequality of bargaining power which results in no real negotiation and "an absence of meaningful choice." ' " (*H. S. Perlin Co.* v. *Morse Signal Devices, supra,* 209 Cal.App.3d 1289, 1301.)

■ Since the common law sanctioned the use of limitation of liability clauses so long as they were not against public policy and not unconscionable, and in light of the legislative materials pertaining to section 2782.5 which indicate no intent to change the law regarding these clauses, we hold that "negotiating" as used in section 2782.5 and applied to a particular contract containing a limitation of liability clause simply means that the agreement was reached between parties wherein each party had an opportunity to accept, reject or modify such a provision.[7] If the parties had such an opportunity with respect to the provision, the provision is valid even if there is no actual discussion regarding the provision but rather it is simply proposed and accepted.[8]

Here the clause was included in a standard form contract submitted by Glenn to Markborough by cover letter dated March 2, 1981, wherein Glenn

[7] Throughout the trial court proceeding and the proceedings in this court, the parties have used the phrase "negotiating and expressly agreeing" with Markborough arguing that the entire phrase means specific disclosure and/or discussion while Glenn and amici curiae argue that the phrase, in its entirety, means simply a fair opportunity to negotiate between parties in an arm's length transaction. However, as we see it, the dispute actually centers only around the word "negotiating." Since Markborough apparently does not contend that there was no "express agreement" we do not decide the meaning of these words.

[8] Whether the parties had the ability or right to negotiate will depend upon a consideration of all of the facts surrounding the transaction, including but not limited to such facts as whether the parties were of relative equal bargaining power and whether it was an arm's length transaction.

stated "If the contract documents are acceptable to you, we can begin work as soon as we receive a copy of the signed contract. We would, of course, have to approve any requested changes before proceeding." The language in this letter indicates that Markborough had an opportunity to request a change in any provision of the contract, including the limitation of liability clause. There was no evidence presented to the trial court to suggest that in fact Markborough had no real opportunity to modify, reject or accept the clause. Accordingly the trial court properly determined that the limitation clause was valid and that Glenn's liability was limited to $67,640.

■ Markborough argues that the inconspicuousness of the provision alone should invalidate the clause.[9] In support thereof, Markborough cites *Conservatorship of Link* (1984) 158 Cal.App.3d 138, 141 [205 Cal.Rptr. 513] and *Windsor Mills, Inc.* v. *Collins & Aikman Corp.* (1972) 25 Cal.App.3d 987, 993-994 [101 Cal.Rptr. 347]. *Link* involved a release of any claims for personal injury which was required as condition for entry into a racing event. The release was printed in five and one-half point type and was not easily readable. The court found the provision unenforceable because it was not conspicuous, not clear and explicit, and not comprehensible. In *Windsor* the plaintiff had placed an order for goods over the telephone. Thereafter, defendant sent an "Acknowledgement of Order" to plaintiff. Buried in small print on the reverse side of the form was an agreement to arbitrate. The court found no valid agreement for arbitration, stating "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, *contained in a document whose contractual nature is not obvious.*" (*Windsor Mills, Inc.* v. *Collins & Aikman Corp., supra*, 25 Cal.App.3d 987, 993, italics added.)

The holdings in these cases are not applicable. We are not faced with a situation wherein a provision is offered on a take-it-or-leave-it basis as in *Link*. Here as previously discussed, Markborough was given the opportunity to negotiate with respect to the limitation of liability provision. Nor does this case involve a situation wherein the provision is contained in a document whose contractual nature is not obvious as in *Windsor*. When the parties are dealing in an arm's length transaction with an opportunity to accept, reject or modify the terms of the agreement, different rules apply. The parties are bound by the terms of the contract even if they do not read it. (*Zurich Ins. Co.* v. *Kings Industries, Inc.* (1967) 255 Cal.App.2d 919, 923-925 [63 Cal.Rptr. 585].) Similarly, "an offeree, knowing that an offer

---

[9] It is not clear whether Markborough intends this as a separate argument or in conjunction with section 2782.5. Since we find nothing in the language of section 2782.5 or its history to suggest that the Legislature was at all concerned about the location or conspicuousness of a limitation clause, we treat this as a separate argument.

has been made to him but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains." (*Windsor Mills, Inc.* v. *Collins & Aikman Corp., supra*, 25 Cal.App.3d 987, 992.)

As stated by the court in *Delta Air Lines, Inc.* v. *Douglas Aircraft Co.* (1965) 238 Cal.App.2d 95, 104-105 [47 Cal.Rptr. 518], "all that is herein involved is the question of which of two equal bargainers should bear the risk of economic loss if the product sold proved to be defective. Under the contract before us, Delta (or its insurance carrier if any) bears that risk in return for a purchase price acceptable to it; had the clause been removed, the risk would have fallen on Douglas (or its insurance carrier if any), but in return for an increased price deemed adequate by it to compensate for the risk assumed. We can see no reason why Delta, having determined, as a matter of business judgment, that the price fixed justified assuming the risk of loss, should now be allowed to shift the risk so assumed to Douglas, which had neither agreed to assume it nor had been compensated for such assumption."

The same is true here. Markborough agreed, whether knowingly or simply because it failed to read the contract, to assume the risk of most of the economic loss which might result from Glenn's negligence in exchange for a consulting fee acceptable to it. There is no justification for allowing Markborough to shift this loss to Glenn which neither agreed to assume it nor was compensated for such assumption.

### DISPOSITION

The alternative writ of mandate is discharged and the petition for writ of mandate is denied.

Timlin J., and McDaniel J.,* concurred.

Petitioner's application for review by the Supreme Court was denied May 2, 1991.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.