115 F.3d 695
 Fed. Sec. L. Rep. P 99,471, 97 Cal. Daily Op. Serv. 4281,
97 Daily Journal D.A.R. 7165
Harvey COHEN; Dawn Ennis; Robert Buckler; Jeffrey Wexler;
Union Equity Partners, Plaintiffs-Appellants,
v.
STRATOSPHERE CORPORATION, Defendant,
and
Yaeger Securities, Inc.; Grand Casino Resorts, Inc.; Lyle
Berman; Bob Stupak; Bob Stupak Enterprises,
Inc.; Andrew S. Blumen, Defendants-Appellees.
 No. 95-16098.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 18, 1996.
Decided June 6, 1997.
 
 Bert M. Brown, Brown & Brown, Las Vegas, NV, Sherrie R. Savett, Todd S. Collins, Berger & Montague, Philadelphia, PA, for plaintiffs-appellants.
 Mark G. Krum, Robert J. Shilliday III, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, Robert C. Rosen, Rosen & Associates, Los Angeles, CA, for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada; David Warner Hagen, District Judge, Presiding. D.C. No. CV-94-00334-DWH.
 Before: CHOY, CANBY, and FERNANDEZ, Circuit Judges.
 OPINION
 CANBY, Circuit Judge.
 
 
 1
 Harvey Cohen, Union Equity Partners, and other plaintiffs appeal the district court's Fed.R.Civ.P. 12(b)(6) dismissal of their claim against Yaeger Securities, Inc., Bob Stupak, Grand Casino Resorts, Inc., and other defendants, for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.
 
 
 2
 Cohen is the class representative of a group of investors ("Investor Class") who attempted to purchase securities ("Units") offered as part of an Initial Public Offering ("IPO") of Stratosphere Corporation. Stratosphere was a defendant in district court and was a party to this appeal, but while the appeal was under submission, Stratosphere filed a Chapter 11 petition in bankruptcy and all further proceedings against it were stayed pursuant to the automatic stay provision of 11 U.S.C. 362(a). We therefore entered an order on April 9, 1997, staying all action in this appeal with regard to Stratosphere Corporation. The order also provided that for all other parties the appeal remained under submission. The automatic stay does not preclude us from deciding this appeal with regard to all parties other than Stratosphere, and we now proceed to do so. See Matter of S.I. Acquisition, Inc., 817 F.2d 1142, 1147 (5th Cir.1987) (automatic stay protects only debtor in Chapter 11 bankruptcy and ordinarily is not available for benefit of nonbankrupt codefendants). The remaining defendants-appellees, to whom our decision today applies, are individuals or corporations that were connected to the offering either as directors, officers or shareholders of Stratosphere, contractors with Stratosphere, or preferred purchasers of the offered securities. References to the "defendants" in this opinion hereafter refer to all defendants other than Stratosphere Corporation.
 
 
 3
 The Investor Class's claim under § 10(b) and Rule 10b-5 is an unusual one, to put it mildly. They do not complain of having purchased stock, to their loss, because of the defendants' misrepresentations. Instead, they complain that they were improperly denied the opportunity to purchase stock at all, and thus were denied a potential gain when the stock rose in value for a time. They allege that the defendants misrepresented that the Units would be sold on a first-come, first-served basis, and concealed the fact that insiders would take priority if the IPO was oversubscribed.
 
 
 4
 Union Equity Partners is the class representative for a group of broker-dealer firms ("Dealer Class") that entered into Selected Dealer Agreements with Yaeger Securities, the investment banking firm that acted as Stratosphere's Sales Agent. Union Equity Partners argues that it was denied commissions and Sales Agent Warrants to which it was entitled because the defendants refused to fulfill the subscription agreements that it solicited from the public.
 
 
 5
 We affirm the district court's dismissal of the plaintiffs' claims. The Investor Class and the Dealer Class both lack standing to sue under § 10(b) or Rule 10b-5 as purchasers of securities.
 
 BACKGROUND
 
 6
 On January 24, 1994, Stratosphere Corporation commenced an initial public offering to raise capital for the construction and operation of the Stratosphere Tower in Las Vegas, Nevada. The IPO involved the offering of "Units"; each Unit was comprised of one share of Stratosphere common stock and one redeemable common-stock purchase warrant.
 
 
 7
 The IPO required that a minimum of 7,000,050 Units be sold for the offering to go forward ("to close"), and limited to 11,700,000 the maximum number of Units for sale. Prior to the opening date of the IPO, Stratosphere executed an agreement with Grand Casino Resorts, Inc. ("Grand"), which obligated Grand to purchase "4,000,000 Units pursuant to the offering, plus such additional Units as are required to enable the Company to achieve the Minimum Offering." As a result, Stratosphere was guaranteed to achieve the IPO's Minimum Offering.
 
 
 8
 Stratosphere engaged Yaeger Securities, Inc. to act as the Sales Agent for the IPO on a "best efforts" basis.[1] As permitted by such an arrangement, Yaeger subsequently executed "Selected Dealer Agreements" with other broker-dealers. These Agreements authorized certain broker-dealers to "find purchasers for the Units acceptable to the Company" "on a best efforts basis only." The Agreement states that all sales of Units "are conditioned upon the receipt and acceptance by the Company of subscriptions for the Minimum Offering" and satisfaction of the other conditions of the Agreement. Finally, the Agreement stated that "no compensation will be paid in respect of subscriptions (or portions thereof) which have been rejected by the Company."
 
 
 9
 In a separate document, dated January 24, 1994, that Yaeger circulated to members of the Dealer Class regarding subscription procedures, Yaeger stated that, with the exception of a preference of 2,500,000 Units for subscribers to an earlier, unsuccessful offering, "all subscriptions will be accepted on a 'first-come, first-served' basis."
 
 
 10
 Stratosphere and Yaeger circulated a Prospectus, also dated January 24, 1994, in connection with the IPO. The Prospectus stated that:
 
 
 11
 Units may be purchased by officers, directors, and employees of the Company and its affiliates (and their respective families) (the "Related Purchasers") ... and the Company will incur no obligation to pay a selling commission to the Sales Agent on account of such sales. There is no limitation on the number of Units which may be purchased by Related Purchasers, and all such purchases will be included for purposes of achieving the Minimum Offering. See "Plan of Distribution."
 
 
 12
 (emphasis added).
 
 
 13
 The Prospectus informed potential investors that subscriptions for Units, along with the full payment of the offering price, had to be received by the Escrow Agent on or before February 22, 1994 (the "Termination Date"). The Prospectus also stated, however, that:
 
 
 14
 [t]he Units are being offered ... subject to prior sale and to the rights of the Original Subscribers described above, receipt and acceptance by the Company, approval of certain matters by counsel and certain other conditions. The Company reserves the right to withdraw or cancel such offer and to reject any subscription in whole or in part.... Pending the Closing, subscription proceeds will be held by the Escrow Agent in an interest-bearing account. Upon acceptance of such subscriptions by the Company and the issuance of the Units, the principal of the escrow account will be remitted to the Company.... If the Closing does not occur by the Termination Date, this offering will be terminated and all subscription funds will be returned promptly to the subscribers, together with interest earned.... Subscriptions deposited in the escrow account may not be withdrawn by investors without the Company's consent.[2]
 
 
 15
 (emphasis added).
 
 
 16
 The Prospectus contains a section entitled "Plan of Distribution." This section describes Stratosphere's "best efforts" sales arrangement with Yaeger, and notes that Yaeger may offer the Units through other Selected Dealers. The Plan reiterates that "[a]lthough there are no arrangements or understandings for purchases of Units by Related Purchasers, there is no limitation on the number of Units which may be purchased by Related Purchasers and all such purchases will be included for purposes of achieving the Minimum Offering."
 
 
 17
 Finally, the Plan of Distribution states, in boldface type:
 
 
 18
 There can be no assurance that if the Minimum Offering is achieved that any additional Units will be sold or that the offering period will not be extended. Subscribers may, therefore, have their subscription funds held in the escrow account for the entire offering period. Subscribers may not withdraw their subscriptions from the escrow account without the written consent of the Company.
 
 
 19
 (emphasis added).
 
 
 20
 Subscription Agreements and a page of instructions regarding completion of the Agreement were attached to the back of each Prospectus. The instruction sheet instructs each subscriber to read the Prospectus carefully and then to complete and sign the Subscription Agreement. The Agreement states that "the undersigned, having received the Prospectus, dated January 24, 1994 ... relating to the offer by [Stratosphere] to sell Units ... hereby subscribes for the number of Units indicated below."
 
 
 21
 The individual plaintiffs (the named representatives of the Investor Class), including Cohen, all sent in signed Subscription Agreements that were dated either January 24 or January 25, 1994, and included full payments for the Units for which they were subscribing. As was explained in the Prospectus, and as is required by Rule 15c2-4, the received payments were placed in escrow pending the closing of the offering.
 
 
 22
 Stratosphere subsequently issued a First Supplement to the Prospectus, dated January 26, 1994, which informed investors of several changes regarding the terms of the offering. The First Supplement states that Grand had increased its commitment to buy Units from 4,000,000 to 5,750,000 (Grand was still committed to purchase such additional Units as were required to meet the Minimum Offering), and explains the possible negative effects arising from Grand's potentially-increased percentage of overall Unit ownership. The Supplement also states that "[a]t the request of the Company and Grand, a portion of the Units offered in the offering ... may be reserved for sale to employees and others having a business relationship with the Company or Grand." Because of these and other changes, the First Supplement allows "[a]ny subscriber who has submitted a subscription of Units prior to the distribution of this Supplement" to withdraw their subscription by 5:00 p.m. on January 28, 1994.[3] None of the plaintiffs withdrew.
 
 
 23
 Stratosphere issued a Second Supplement to the Prospectus on February 3, 1994. The Second Supplement states that affiliates of Stupak and Blumen had submitted subscriptions for a total of 528,000 Units, "consistent with the plan of distribution described in the Prospectus," and explains that the percentage of beneficial ownership of Units by Stupak and Blumen would increase "if these subscriptions are accepted in full, as is the Company's present intention." Directing the reader back to the terms of the Prospectus and the First Supplement, the Second Supplement reiterates that, subject to the rights of Original Subscribers, Stratosphere "reserves the right to withdraw or cancel such offer and to reject any subscription in whole or in part. The Company has and will continue to exercise its discretion in determining whether and to what extent subscriptions will be accepted." Finally, the Supplement informs investors that subscriptions for "an aggregate of 8,773,300 Units" had been received as of February 2, 1994.
 
 
 24
 Stratosphere issued its Third (and final) Supplement to the Prospectus ("Third Supplement") on February 17, 1994. The Third Supplement reminded investors that, pursuant to the First Supplement, a portion of the Units offered for sale may be reserved for sale to employees and others having a business relationship to Stratosphere or Grand. This Supplement states that the Units subscribed for by such persons, as well as by "others who have family or personal relationships" with principals of these companies, aggregated 2,350,000 Units. It also informs investors that because Stratosphere had received subscriptions in excess of the Maximum Offering as of February 17, 1994, "it will return all subscriptions hereafter received. The Company has and will continue to exercise its discretion in determining whether and to what extent subscriptions will be accepted."
 
 
 25
 Because the IPO was oversubscribed, Cohen and the other named plaintiffs did not receive all of the Units for which they subscribed. Cohen and Dawn Ennis received only 10,000 of the 175,000 Units for which they jointly subscribed, Robert Buckler received only 4,000 of the 15,000 for which he subscribed, and Jeffrey Wexler received only 2,000 of the 7,000 for which he subscribed. Stratosphere returned to these investors their payments, with interest, for Units that they did not receive. On February 24, 1994 (the day after the closing of the offering) the Units, which had been offered for $5 or less in the IPO, were sold on the NASDAQ for a price of up to $11.
 
 
 26
 Union Equity Partners received commissions and Sales Agent's Warrants only for the Units actually sold to their customers, and not for their customers' unfilled subscriptions. Thus, Union Equity received $186,704 in commissions and 45,798 Sales Agent Warrants, instead of the $341,624 and 84,973 Sales Agent Warrants it would have received if all of their customers' subscriptions had been fulfilled.
 
 
 27
 Plaintiffs filed a class action complaint in the United States District Court for the District of Nevada. The complaint alleged violations of §§ 11 and 15 of the Securities Act of 1933, §§ 10(b) and 20A of the Securities Exchange Act of 1934, and Rule 10b-5. It also asserted various state law fraud and breach of contract claims. Defendants filed three separate motions to dismiss. After a telephonic hearing on March 30, 1995, the district court dismissed the federal securities claim with prejudice pursuant to Fed.R.Civ.P. 12(b)(6). The district court did not issue a written order explaining its reasons for granting the motion, but simply stated that it did not believe that § 10(b) covered such situations. The district court dismissed the state-law claims without prejudice.
 
 
 28
 Plaintiffs now appeal the district court's Rule 12(b)(6) dismissal of their § 10(b) and Rule 10b-5 claims.[4]
 
 ANALYSIS
 
 29
 We review de novo a district court's dismissal of a plaintiff's claims pursuant to Fed.R.Civ.P. 12(b)(6). See In re VeriFone Securities Litigation, 11 F.3d 865, 868 (9th Cir.1993).
 
 I. STANDING
 A. The Investor Class
 
 30
 Section 10(b) and Rule 10b-5 prohibit deceptive practices "in connection with the purchase or sale of any security." In Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court interpreted this restriction to limit relief under Rule 10b-5 to plaintiffs who had either purchased or sold securities. The plaintiffs in Blue Chip alleged that the offeror had made misleadingly pessimistic statements in connection with its offering, causing the plaintiffs to forego purchasing shares at bargain prices. The Court noted that the limitation of § 10(b) to deception "in connection with the purchase or sale of any security" was significantly narrower than § 17(a) of the 1933 Securities Act, which reaches fraud "in the offer or sale of securities." See id. at 733-34, 95 S.Ct. at 1924-25 (emphasis added). After discussing the additional policy reasons for limiting Rule 10b-5 relief to purchasers and sellers, the Court held that the plaintiffs were not entitled to maintain their action. Id. at 749, 95 S.Ct. at 1931-32.
 
 
 31
 The defendants here argue that the Investor Class is in the same position as the plaintiffs in Blue Chip: they neither purchased nor sold any of the Units in issue. Section 3(a) of the 1934 Act, however, defines a "purchase" or "sale" of securities to include "any contract" to purchase or sell a security. See Blue Chip, 421 U.S. at 750-51, 95 S.Ct. at 1932-33. The Investor Class claims that it had contracts to purchase securities, and that its members accordingly have standing as "purchasers" to bring this action under § 10(b) and Rule 10b-5.
 
 
 32
 We conclude that the members of the Investor Class did not have binding contracts to purchase securities from Stratosphere sufficient to confer standing under § 10(b). In light of the conditions of the offering set forth in the Prospectus, the mere execution of Subscription Agreements by members of the Investor Class did not create enforceable contracts for the purchase or sale of securities.
 
 
 33
 The Investor Class contends either that the Prospectus was an offer that was accepted when the investors submitted subscription agreements and tendered payment, or that a contract of purchase was formed when the subscription agreements were received and the payments placed in an escrow from which the investors were not free to withdraw. The documents upon which the Investor Class relies in its complaint, however, refute any such contention.
 
 
 34
 The Prospectus and subsequent Supplements make clear that Stratosphere was not undertaking a firm commitment to sell securities. At most, the Prospectus was a solicitation of offers, to be submitted in the form of subscription agreements. The Prospectus states that "there can be no assurance that if the Minimum Offering is achieved that any additional Units will be sold," and reserves the "right to withdraw or cancel such offer and to reject any subscription in whole or in part." The mutual assent and intent to be bound that are required for the formation of a contract to sell securities, therefore, is absent in this case.
 
 
 35
 Similarly, any proposal to sell shares inherent in the receipt of a subscription agreement and the placing of the purchase money in escrow was conditional at best. Under its Prospectus, Stratosphere was still free to decide whether to sell Units beyond the Minimum Offering number, and Stratosphere was still free to decide whether to accept a particular subscriber's subscription. It may be that the escrow agreement constituted a contract under which the investors agreed to hold their offers to purchase shares open, and Stratosphere agreed to refund the subscription payments if it rejected the offers to purchase, but such a contract is not a binding contract to purchase and sell shares. Stratosphere retained the right to reject subscriptions. A promise conditioned on a performance by the promisor constitutes an illusory promise. See Restatement (Second) of Contracts, §§ 76, 77. "Words of promise do not constitute a promise if they make performance entirely optional with the purported promisor." Id. § 76, cmt. d; see also id. § 77, cmt. a. Thus, even if the subscribers are viewed as promisors who irrevocably committed themselves to purchase securities by executing the Subscription Agreement, a contract of purchase was not formed because Stratosphere made no return promise to sell the securities. Cf. id. § 77, illus. 1 (No contract formed when A offers to deliver to B at $2 a bushel as many bushels of wheat, not exceeding 5,000, as B may choose to order within the next 30 days, and B accepts, agreeing to buy at that price as much as he chooses to order within that time).
 
 
 36
 The Investor Class attempts to avoid this reasoning by arguing that the phrase "best efforts" in the Prospectus impliedly narrowed the conditions of sale so that the conditions did not render the promise illusory. It claims that "best efforts" is synonymous with "first-come first-served," and that such an interpretation is customary in the investment industry. The Prospectus, however, does not state that the Offering is "first-come first-served," and the Plan of Distribution's description of the Sales Agent's agreement "to use its best efforts" clearly defines the term "best efforts" as it is used in the Prospectus. Thus, even if there were an industry custom of first-come, first-served acceptances, Stratosphere's express reservation of an option not to sell any securities to the public, and of a right to reject any or all subscriptions at its discretion, made unreasonable as a matter of law the Investor Class's assumption that the alleged industry custom was operative.
 
 
 37
 Finally, we find untenable the Investor Class's theory that the Subscription Agreement constituted an offer that Stratosphere accepted by placing the funds into escrow. The use of an escrow account is required by law. See Rule 15c2-4, 17 C.F.R. 240.15c2-4. Stratosphere's Prospectus clearly distinguished between receiving subscriptions and accepting or filling subscriptions. It had no contractual duty to fill particular subscriptions.[5]
 
 
 38
 In sum, we conclude that, as a matter of law, the members of the Investor Class do not have standing under § 10(b) because the execution of their Subscription Agreements did not create a binding contract for the purchase of securities from Stratosphere.
 
 B. The Dealer Class
 
 39
 The Dealer Class contends that it is in a different position from that of the investors. It argues that its members had a contract to purchase securities under the Selected Dealer Agreements that they had entered with Yaeger Securities. Those agreements provided that the dealer would be paid a certain commission on sales, and if the dealer sold more than 400,000 Units, he or she would be given a percentage of a Sales Agent Warrant for each Unit sold. When this agreement is interpreted in light of the contemporaneous bulletin from Yaeger stating that "[a]ll subscriptions will be accepted on a 'first-come, first serve' " basis, the Dealer Class contends that its members had binding contracts to receive warrants, and are therefore "purchasers" for purposes of § 10(b) and Rule 10b-5.
 
 
 40
 The dealers certainly had a binding contract with Yaeger which governed the manner in which they provided their sales services, but that contract did not bind Stratosphere or Yaeger to deliver warrants to the dealers for shares not sold by Stratosphere. The Selected Dealer Agreement authorized signatory dealers "to find purchasers of Units acceptable to the Company. " (Emphasis added). The Agreement provided for partial payment in warrants, if certain levels were reached, for "each Unit sold to investors solicited by" the dealer. (Emphasis added). The "Compensation" section of the same agreement provided for compensation to be paid by Yaeger "in respect of subscriptions submitted by you on behalf of investors who were issued Units at [the] Closing. " (Emphasis added). The section also stated: "Notwithstanding the foregoing, no compensation will be paid in respect of subscriptions (or portions thereof) which have been rejected by the Company." Under this agreement, the dealers would have had a contractual right to "purchase" the warrants if Stratosphere in fact had accepted the disputed subscriptions and issued the Units to the subscribers. The dealers would then qualify as "purchasers" even if Stratosphere or Yaeger had refused to issue the contracted-for warrants. See Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 559 (2d Cir.1985) (contract to sell stock constitutes a "sale" even if stock was not in fact sold). But when Stratosphere rejected the subscriptions, no contract to purchase warrants came into existence for the dealers. The plain terms of the Agreement preclude it.
 
 
 41
 The dealers solicited subscribers whose agreement the dealers knew was subject to the Prospectus. As we have already pointed out in discussing the claims of the Investor Class, the Prospectus made it clear that Stratosphere retained the right to reject any subscription. The Selected Dealer Agreement conferred on the dealers no greater right than that possessed by the investors to force Stratosphere to accept any particular subscription.
 
 
 42
 Whether the statement made to the dealers that "subscriptions will be accepted on a 'first-come, first-serve' basis" gave rise to any right of the dealers to recover under state law is a matter upon which we express no opinion. We conclude only that it does not qualify as deception "in connection with the sale or purchase of any security," because the dealers had no binding contractual right to receive warrants under their agreement and under the Prospectus governing the sale. As a result, the Dealer Class lacks standing to maintain an action under § 10(b) or Rule 10b-5.CONCLUSION
 
 
 43
 Because we conclude that the Investor Class and the Dealer Class both lack standing to bring a § 10(b) or Rule 10b-5 claim against defendants, we affirm the district court's Rule 12(b)(6) dismissal of those claims insofar as they were asserted against all defendants-appellees other than Stratosphere Corporation. No challenge is presented by plaintiffs to the district court's dismissal without prejudice of their state-law claims, and that dismissal is also affirmed as to all defendants-appellees other than Stratosphere Corporation. The appeal as to defendant-appellee Stratosphere Corporation remains stayed.
 
 
 44
 AFFIRMED AS TO ALL CLAIMS AGAINST ALL DEFENDANTS-APPELLEES OTHER THAN STRATOSPHERE CORPORATION.
 
 
 45
 PROCEEDINGS ON APPEAL AS TO ALL CLAIMS AGAINST STRATOSPHERE CORPORATION REMAIN STAYED.
 
 
 
 [1]
 A best efforts offering requires the sales agent to use its best efforts to sell the securities, in contrast to a firm commitment offering, in which a brokerage firm commits to purchase a certain number of securities, then attempts to resell them to the public. See I Louis Loss & Joel Seligman, Securities Regulation 341-43 (3d ed. 1989). Contrary to the plaintiffs' allegations, "best efforts" describes the relationship between the corporation and the sales agent, and is not synonymous with a "first come-first served plan for distribution of the securities among subscribers."
 
 
 [2]
 The use of an escrow in "minimum/maximum" offerings is required by Rule 15c2-4, 17 C.F.R. § 240.15c2-4, to ensure that investors receive a refund of their subscription fees in the event that the minimum offering is not achieved
 
 
 [3]
 Rule 10b-9, 17 C.F.R. § 240.10b-9, requires that notification of such changes in the offering be accompanied by an option for investors to withdraw their subscriptions
 
 
 [4]
 Plaintiffs have not presented any argument relating to their claims under the Securities Act of 1933, or under § 20A of the Securities Exchange Act of 1934. We therefore deem those claims to have been abandoned. See Schneider v. TRW, Inc., 938 F.2d 986, 993 (9th Cir.1991)
 
 
 [5]
 The Investor Class relies on S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1324 (11th Cir.1982), which concluded that a sale occurred when investors placed funds in escrow and were irrevocably committed to purchase. It does not appear, however, from the Carriba opinion that, short of withdrawing the entire offering, the offeror retained the right to reject any subscription. Nor do the other securities cases relied upon by the Investor Class involve instances where the offeror retained the right to reject subscriptions and exercised that right