**ATEL FINANCIAL CORPORATION,**
Plaintiff,

v.

**QUAKER COAL COMPANY,**
Defendant.

No. C 98–02971 TEH.

United States District Court,
N.D. California.

March 9, 2001.

Robert B. Kaplan, Jeffer Mangels Butler & Marmaro, San Francisco, CA, David M. Wiseblood, K. Bradley Rogerson, Frandzel Share Robins Kaplan & Bloom LC, San Francisco, CA, for plaintiff.

Richard W. Nichols, Michael T. Fogarty, McDonough Holland & Allen, Sacramento, CA, Gillard B. Johnson, Wilson Stanley Bowling & Costanzo, Lexington, KY, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND JUDGMENT (FRCP 54 & 58)

THELTON E. HENDERSON, District Judge.

### INTRODUCTION

This action, in essence, is a suit by a leasing company to collect damages from a lessee which allegedly breached a contract between the two parties by retaining leased equipment without making full timely payments. The lessor now seeks to enforce the liquidated damages provision of the lease. The lessee admits that a technical default occurred, but asserts that it cured the default and that any imposition of liquidated damages would be unfair and would unjustly enrich the plaintiff.

The case was tried to the Court without a jury on January 11 and 12, 2000. Having carefully considered the parties' papers, the oral argument of counsel, the

written and oral testimony of all witnesses, all other evidence presented in the case, the parties post-trial briefs, and the record herein, the Court rules that plaintiff is not entitled to liquidated damages, as discussed in detail below.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Atel Financial Corporation ("Atel"), and defendant, Quaker Coal Company ("Quaker"), entered into a Master Lease Agreement ("the Lease") on October 22, 1993. (Plaintiff's Exhibit ["Pl's Exh."] 1) Atel is a California corporation that leases heavy industrial equipment. Quaker is a Kentucky corporation that engages in coal mining. The Lease states that Atel would provide Quaker with approximately twenty (20) pieces of heavy mining equipment, such as dump trucks, wheel loaders, drills, and bull dozers. (Court Transcript of Trial, January 11–12, 2000 ["CT"] at 43). The Lease provided for separate schedules identifying each particular piece of equipment, the lease term for each piece, the commencement date, and the amount of basic rent. Five separate schedules were entered into which form the basis of the instant suit; these are identified as Schedules 1, 7, 8, 9, and 10.[1]

From 1993 to 1997, the leasing activity appears to have gone relatively smoothly, with the equipment being provided and with timely rental payments being made. However, in December 1997, Quaker requested a moratorium from all of its lessors for a period of time to permit Quaker to refinance its outstanding debt. (CT 236; Pl's Exh. 7) Atel responded to the forbearance request with a series of nine conditions, contained in a letter of December 31, 1997. (Pl's Exh. 8) By letter dated February 14, 1998, Quaker accepted certain of the conditions, and remitted a payment of $91,229.66, bringing the lease current as of December 31, 1997. (CT 240; Pl's Exh. 10; Def's Exh. 120)

While Quaker characterizes this as a full acceptance of Atel's conditions, it is apparent from the correspondence that certain of the conditions were not completely accepted. For example, Atel's fourth condition was: "ATEL will require corporate guarantees from each affiliated entity of Quaker Coal Company, as well as personal guarantees of the ultimate principal(s) of such affiliated companies." (Pl's Exh. 8) Quaker's response to this condition, in the February 14 letter, was: "I will discuss the guarantee of Mr. Chickering next week upon his arrival. My suggestion to him and to ATEL will be to give his guarantee if it will be released upon the expiration of the forbearance. Any other corporate guarantees you request will be granted." (Pl's Exh. 10) Although Quaker's Vice President and Chief Financial Officer, Michael Castle, testified that he believed Quaker had thereby complied in full with Atel's requirements, his belief is not supported by any reliable evidence. Indeed, Atel contests Mr. Castle's interpretation of the events, and there is no evidence in the record indicating that Quaker ever accepted the remainder of the conditions that it had left conditional or unaccepted in its February 14 letter. Further, the guarantees were never delivered. (CT 261)

On May 12, 1998, Atel sent another letter to Quaker, entitled "Notice of an Event of Default and Demand..." In this letter, Atel triggered enforcement of sections 4 and 9 of the Lease, which govern late payment and liquidated damages. The letter also offered to allow Quaker to cure the default by agreeing to conditions above and beyond those set forth initially in the December 31, 1997 letter. (Pl's Exh. 11) By letter of May 26, 1998, Quaker expressed surprise at Atel's actions, offered to "make every effort to satisfy the requests" that Atel had initially made, and included the January 1998 lease payments.

---

1. The Master Lease Agreement and all Schedules and Addenda are contained in Plaintiff's Exhibit 1 and Defendant's Exhibits 101, 102, 106, 108, 110, and 112.

Quaker also stated that Mr. Chickering's personal guarantee would be provided if it would be "released upon completion of financing and becoming current with all lease payments and late fees." (Pl's Exh. 12) It is not clear whether this limitation on Mr. Chickering's guarantee would constitute full acceptance of Atel's condition, although it is clear that Atel never agreed to Quaker's precise limiting language. (CT 262) More importantly, however, Quaker unequivocally rejected the new conditions contained in Atel's May 12 letter. (Pl's Exh. 12) Thus, from the evidence before the Court, it cannot be said at this point that the parties had reached a complete meeting of the minds.[2]

Shortly thereafter, on May 29 and June 1, 1998, Quaker made two payments, amounting to $674,985.99. (Def's Exh. 121, 122) Mr. Castle testified that these payments were made at Atel's instruction. (CT 242–43) On June 4, 1998, Atel wrote to Quaker, stating that Quaker's May 26 response was inadequate, and that Atel was now formally declaring Quaker in default and was demanding liquidated damages. (Pl's Exh. 13) Atel noted that while Quaker had made partial payment on its past due obligations in the amount of $674,985.99, there remained an outstanding past due balance of an equal amount, as well as $50,221.52 in late charges, and that Quaker had been in "continuous default of its payment obligations under the Lease for six months." (Pl's Exh. 13) By letter of June 10, 1998. Atel notified Quaker that since the forbearance conditions of May 12 had not been met, they would be withdrawn. (Pl's Exh. 14) Atel also reiterated its demand for liquidated damages, adding its recognition that the amount would be reduced by all future payments or proceeds from the disposition of the assets. (Pl's Exh. 14)

In the third week of June, 1998, Quaker closed on its loan restructuring. (CT 245) Quaker then sent Atel a check for all outstanding invoices, in the amount of $583,756.33, on June 22, 1998, by overnight service. (CT 245; Def's Exh. 123)

The day after Quaker sent the check for all outstanding invoices, Atel filed a Complaint in San Francisco Superior Court. The Complaint contains a single cause of action for breach of contract, and seeks liquidated damages in an amount it calculates at $4,624,357. (Pl's Exh. 2) The case was removed to federal court on the basis of diversity of citizenship, and a bench trial was conducted on January 11 and 12, 2000.[3]

The parties agree that by the time of trial, all past due payments had been made. (CT 113–14). Furthermore, at least to the time of trial, Quaker has made timely payment on all of Atel's subsequent invoices. (CT 40, 247) In sum, Quaker paid approximately $4.8 million for the use of equipment commencing in January 1998. (CT 19) Furthermore, the equipment relating to Schedule 1 has been returned to Atel, which in turn has sold it. (CT 18) Schedules 8 and 10 were renewed and the renewals remained in effect at the time of trial.[4]

Following trial, on June 16, 2000, Quaker filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. This filing stayed the continued prosecution of the pending action pursuant to 11 U.S.C. section 362(a)(1). The stay additionally precluded this Court from issuing

---

**2.** Furthermore, plaintiff correctly points out that even if such a forbearance had been finalized, it lacked consideration, as Quaker was not providing anything beyond what it had already contracted to do. (CT 271)

**3.** On July 30, 1998, Quaker demanded a trial by jury. However, on November 23, 1999, Quaker filed a Waiver of Demand for Jury

Trial, requesting "that the action be tried to the Court without a jury."

**4.** There is no testimony as to the equipment under Schedules 7 and 9, which are of relatively little value (totaling approximately $590,000 in original cost, compared with approximately $12,200,000 for all the equipment combined).

its ruling. *See Benedor Corp. v. Conejo Enter., Inc.,* 96 F.3d 346, 351 (9th Cir. 1996); *Cohen v. Stratosphere Corp.,* 115 F.3d 695, 697 (9th Cir.1997); *Roberts v. Heim,* 184 B.R. 814, 816 (N.D.Cal.1995). By letter to the Court dated June 21, 2000, counsel for Atel stated its understanding that the bankruptcy filing would prevent the Court from issuing a ruling, and notified the Court that Atel would seek limited relief from the Bankruptcy Court to permit this Court to rule. The parties subsequently entered into a stipulation to that effect, and received approval from the United States Bankruptcy Court for the Eastern District of Kentucky on November 1, 2000. Specifically, the Stipulation and Order "permit[s] the District Court to render its ruling" and provides that "ATEL may not take any action to enforce a favorable judgment..." *See* Notice of Entry of Order on Stipulation Modifying Automatic Stay, filed November 9, 2001.

## DISCUSSION

### A. Breach of Contract

■ The starting point for our analysis is whether Quaker breached the contract with Atel when it failed to make timely lease payments during the first half of 1998. The essential elements of a cause of action for breach of contract, which is the sole claim in this case, are, under California law, as follows: (1) a valid contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) resulting damages. *See Reichert v. General Ins. Co.,* 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968). The existence of a valid contract in the form of the Master Lease Agreement is not in dispute. Likewise, plaintiff's performance by providing the equipment to Quaker is not in dispute.

With respect to whether a breach occurred, the undisputed evidence shows that in January and February of 1998 Quaker was in default on its payments. (CT 73, 77, 260, 261) By May 1998, Quaker was over $ 1 million in arrears. (CT 78,

262) These payment failures fit squarely within the first defined "Event of Default" under the Lease, which provides as follows: "The occurrence of any one of the following shall constitute an Event of Default hereunder: (a) Lessee fails to pay an installment of rent on or before the date when the same becomes due and payable." (Pl's Exh. 1, para. 9(a)) Thus, the Court finds that Atel has successfully met its burden of establishing a breach through non-payment.

■ Quaker, while conceding a "technical" default through non-payment, argues that its non-payment was acceded to by Atel, so that a breach never occurred. However, Quaker's position is based upon its agents' verbal communications with Atel and upon its interpretation of correspondence that simply does not provide sufficient evidentiary support to sustain it. As discussed above, Quaker purportedly believed that it had met Atel's condition for forbearance; but the evidence shows that Quaker in fact had not unconditionally agreed to all of Atel's terms, so that it had no reasonable basis to believe that its inability to make timely payments would be excused. (Pl's Exhs. 8 & 10, CT 261) Notably, Quaker provides no legal authority whatsoever to support its position.

■ Quaker further argues that Atel's acceptance of partial payment, along with late payment interest, during the period of non-compliance, shows that "ATEL was attempting to coerce Quaker into amending or changing the terms of the MLA to its satisfaction and to the detriment of Quaker. The 'strong arm tactic' employed by ATEL to accomplish this goal was the declaration of a default and the assessment of liquidated damages ..." (Def's Post–Trial Reply at 4) Again, Quaker provides no legal authority to support its position. It is not the role of this Court to regulate the contractual practices of corporations when they are engaged in efforts to informally resolve their differences. Quaker seeks to have this Court declare, on the

basis of no legal authority, that Atel should be reprimanded for its purportedly aggressive response to Quaker's non-payment by determining that a breach never in fact occurred. The Court is unwilling to reach so far.

■ Atel also argues that Quaker breached the contract through a "credit default." At trial, the Court instructed the parties to address in post-trial briefing, among other questions, the difference between monetary and credit defaults. (CT 297) Atel failed to specifically respond to this query. However, in its post-trial brief, Atel argues that the Lease provision defining an "Event of Default" as "lessee's admission in writing of its inability to pay its debts as they become due" forms a separate basis for its breach of contract claim. (Pl's Exh. 1, para. 9(d)) Thus, it is clear to the Court that Atel's use of the term "credit breach" is a means of distinguishing Quaker's notification of inability to pay from Quaker's subsequent and actual failure to pay. The evidence supporting the "credit breach" includes Quaker's letter to Atel on December 18, 1997, in which Quaker stated that it was "experiencing poor liquidity," "recent poor financial performance," "the freezing of our revolving line of credit," recent quarterly losses of approximately $ 4 million, the "anticipation of continued liquidity issues for the next 90–120 days," and a request for a moratorium on all lease and debt payments for a three month period. (Pl's Exh. 7) While the evidence shows that Quaker clearly was in a state of financial difficulty, if not distress, the evidence in the form of written statements of financial difficulty and a request for forbearance do not necessarily equate with an "admission in writing of [an] inability to pay [one's] debts as they become due," which is the standard established by the Lease. Thus, looking at the "credit default" as an entirely separate breach, the Court finds that plaintiff has failed to meet its burden to establish this element of the cause of action.

**B. Liquidated Damages**

Section 9(e) of the Lease provides as follows:

> Upon the occurrence of an Event of Default, Lessor may at its option … (iii) recover from Lessee, as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the present value of all monies to be paid by Lessee during the remaining Basic Term or any successive period then in effect, plus the present value of any balloon payment and the anticipated residual of the Equipment, calculated by discounting at the rate of six percent (6%) per annum compounded monthly, which payment shall become immediately due and payable…

(Pl's Exh. 1) "Anticipated residual value" is the lessor's estimate of its remaining ownership value at the end of the lease transaction. (CT 27, 68)

Section 9 additionally provides:

> In the event that Lessee shall have first paid to Lessor … the liquidated damages … the party having received such liquidated damages shall pay to Lessee … all rentals or proceeds received from any reletting of the Equipment during the balance of the Basic Term (after deduction of all expenses incurred in connection therewith)… Lessee shall in any event remain fully liable for reasonable damages as provided by law and for all costs … on account of default including … court costs and reasonable attorney's fees.

(Pl's Exh. 1)

■ Under California law, liquidated damages are enforceable if at the formation of the contract: (1) it was mutually recognized that damages from a breach would be impracticable or extremely difficult to determine with certainty; and (2) the amount or formula stipulated by the parties represented a reasonable endeavor to ascertain what such damages might be. *Vrgora v. Los Angeles Unified School Dist.*, 152 Cal.App.3d 1178, 1186, 200 Cal.

Rptr. 130 (1984). The burden of proof is on Quaker, as the party seeking invalidation, to show that "the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civil Code sec. 1671(b).[5]

▓▓▓ A liquidated damages clause will generally be considered unreasonable, and hence unenforceable, if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. *Ridgley v. Topa Thrift & Loan Ass'n,* 17 Cal.4th 970, 977, 73 Cal.Rptr.2d 378, 953 P.2d 484 (1998). An amount disproportionate to the anticipated actual damages is termed a "penalty." The California Supreme Court has held: "Pursuant to these principles, charges for late payment of loan installments [are] unenforceable where they bore no reasonable relationship to the injury the creditor might suffer from such late payments." *Id.* at 978, 73 Cal.Rptr.2d 378, 953 P.2d 484.[6]

Quaker characterizes the liquidated damages provision as a means of coercing timely payment through the application of a massive penalty. The courts have disapproved and invalidated provisions that act in a coercive manner. *See, e.g. Garrett v. Coast and Southern Fed. Sav. & Loan Assn.,* 9 Cal.3d 731, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973). However, the term "coercive" cannot be bandied about too loosely, as the courts have recognized that a "liquidated damages provision is not invalid merely because it is intended to encourage a party to perform, so long as it represents a reasonable attempt to anticipate the losses to be suffered." *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal. App.4th 645, 656, 60 Cal.Rptr.2d 677.

To find guidance in distinguishing between situations involving a "penalty" (or "forfeiture") and those involving a reasonable attempt to anticipate losses, we look to the decisions of the California appellate courts in analogous situations. The most recent decision squarely addressing this issue is found in the state Supreme Court's opinion in *Ridgley v. Topa Thrift & Loan Ass'n,* 17 Cal.4th at 977, 73 Cal.Rptr.2d 378, 953 P.2d 484, where the court applied the same liquidated damages provision as the one applicable to the instant case, i.e. Civil Code section 1671(b). In *Ridgley,* defendant loaned plaintiff $2.3 million for two years, secured by real property plaintiffs intended to sell. Under the loan agreement, plaintiff agreed to pay defendant a liquidated damage amount, termed a "prepayment fee," equivalent to six months interest, if he sold the property before the loan matured and if he had been more than 15 days late on any of its scheduled interest payments or had defaulted in any other way. Plaintiff did sell the property early, and was late with an interest payment, triggering a prepayment charge of $113,000. *Id.* at 973, 73 Cal.Rptr.2d 378, 953 P.2d 484. The state high court noted that the contract contained a separate provision for a late payment fee equal

---

5. Since 1872, the California Civil Code has placed limits on liquidated damages clauses, by enforcing them only if the determination of actual damages was impracticable or extremely difficult at inception. However, the Code was amended in 1977 to somewhat liberalize that standard, by adopting the rule as described in the text above, now found at Civil Code section 1671(b). The strict standard, now found at section 1671(c) & (d), was retained only for contracts involving consumer goods and services and leases of residential real property. *See Ridgley v. Topa Thrift & Loan Ass'n,* 17 Cal.4th 970, 977, 73 Cal. Rptr.2d 378, 953 P.2d 484 (1998).

6. In this case, the Lease specifically states that the liquidated damages are not a penalty. However, the California courts have "consistently ignored form and sought out the substance of arrangements" to determine whether penalties are being imposed. *Id.* at 979, 73 Cal.Rptr.2d 378, 953 P.2d 484; *see also Sybron Corp. v. Clark Hospital Supply Corp.,* 76 Cal.App.3d 896, 900 & n. 3, 143 Cal.Rptr. 306 (1978) (the parties' mutual agreement that "the event of default is not a forfeiture or penalty" would not govern, as the "parties may not circumvent the public policy of sections 1670 and 1671 by characterizing penalties as something else").

to 10 percent of the payment due, which the court found reasonable.[7] In contrast, the court determined that the prepayment fee would result in a severe penalty, and that its intent and effect "was to coerce timely payment of interest, not to compensate [plaintiff] for interest payments lost through prepayment of principal." *Id.* at 980, 73 Cal.Rptr.2d 378, 953 P.2d 484. Key to the court's decision was the determination that the prepayment charge was "logically unrelated to the charge's purported function as compensation for prepayment, since an early sale would deprive plaintiff of future interest payments regardless of whether defendant had been late on past payments." *Id.* at 981, 73 Cal.Rptr.2d 378, 953 P.2d 484. Thus, the court invalidated the liquidated damages provision.

In *Garrett v. Coast Southern Fed. Sav. & Loan Assn.*, 9 Cal.3d 731, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973), the California Supreme Court considered a provision which imposed a charge for late payment of installments due under a trust deed, but computed that charge as a percentage of the unpaid principal balance. Defendant savings and loan association contended that the provision did not impose a penalty for breach of obligation, but offered borrowers an alternative method for performing their obligation. The court concluded, however, that the liquidated damages provision was invalid because it calculated damages on the basis of the entire unpaid balance, not on the basis of the amount of the overdue installment or the cost to the defendant. *Id.* at 740, 108 Cal.Rptr. 845, 511 P.2d 1197.[8]

In other loan repayment cases, the California courts have limited fees to an amount necessary to compensate for the actual damages occasioned by delayed payment and to defray the administrative costs legitimately associated with delayed payment. *See Baypoint Mortgage v. Crest Premium Real Estate Investments Retirement Trust*, 168 Cal.App.3d 818, 829–30, 214 Cal.Rptr. 531 (1985) (provision allowing lender to foreclose because of late installment payments unenforceable as penalty or forfeiture).

In *Sybron Corp. v. Clark Hospital Supply Corp.*, 76 Cal.App.3d 896, 143 Cal.Rptr. 306 (1978), a seller and buyer settled a lawsuit over the sale of hospital beds by agreeing that the buyer would pay the seller $72,000 in 12 equal monthly installments with interest on the unpaid balance at 10 percent, with the proviso that if the buyer should default on any payment, then, after 10 days notice of default and opportunity to cure, stipulated judgment for $100,000 could be entered in the seller's favor. After paying $42,000 the buyer became delinquent with five late installment payments. On proper notice, the seller obtained a stipulated judgment for $100,000. A few months later, the buyer offered to pay with interest the delinquent installments owing on the agreed $72,000, an offer which the seller rejected. On appeal the buyer contended that the

---

**7.** Quaker argues that late payment provision in paragraph 4 of the Lease should prevail over the liquidated damages provision in paragraph 9. Analogous to *Ridgley*, Paragraph 4 provides: "Interest on any past due payments shall accrue at the rate of 1–1/2% per month ... and shall be payable on demand." (Pl's Exh. 1 at 2) Atel's general counsel explained the compensatory function of the 1 and 1/2% late charge as being "intended to compensate in this case the lessor for the loss of the use of the money that was owed to the lessor for the period of time that the payment was late." (CT 210) Plaintiff responds, however, by contending that the late payment provision is for brief delays, such as a 15–day

late payment, whereas Quaker was in a six month default which at one point reached a level over $1 million. (CT 40)

**8.** Although *Garrett* predates the 1977 changes to the legislation regarding liquidated damages, it has been affirmed by the California Supreme Court as a proper "analysis of unjustified late fees as unenforceable penalties." *Ridgley*, 17 Cal.4th at 981 n. 5, 73 Cal.Rptr.2d 378, 953 P.2d 484; *cf. In re DWS Investments, Inc.*, 121 B.R. 845 (C.D.Cal.1990) (recognizing *Garrett* as a proper statement of California law).

$28,000 differential between the installment obligation of $ 72,000 and the stipulated judgment of $100,000 constituted an unenforceable penalty and forfeiture imposed on the buyer for nonpayment of $30,000. *Id.* at 898, 143 Cal.Rptr. 306.

The trial court refused to relieve the buyer of the liquidated damages obligation on the ground that damages would have been difficult to fix, and therefore the assessment was valid. While not disputing that point, the court of appeal held that the trial court erred in "fail[ing] to take into account the need for proportion in damages—the critical item in evaluating penalty and forfeiture." *Id.* at 903, 143 Cal.Rptr. 306. The court of appeal stated: "We think the penalty at bench bears no reasonable relationship to actual damages suffered by respondent as the result of delay but to the contrary appears grossly disproportionate in amount... [T]he equitable powers of the court exist to insure that the ultimate obligation imposed on the debtor is not unreasonable *in proportion* to the original obligation and the seriousness of the default." *Id.*

■■■ With this review of the California courts' approach to liquidated damages clauses in mind, the Court finds that the formula for calculating liquidated damages in this case constitutes a penalty. By requiring a defaulting lessee to pay the present value of all monies to be paid by lessee during the remaining term of the lease, plus the anticipated residual value of the equipment, implementation of the liquidated damages clause would multiply Atel's likely actual damages many times over. While such a formula might be reasonable in the event of destruction to the equipment,[9] where *no future value* in the equipment remains, it is highly disproportionate to the loss of only a limited number of loan payments.

The court recognizes, however, that the amount of liquidated damages is mitigated by the contractual provision that all rentals or proceeds received from any reletting of the equipment during the balance of the lease term would be paid back to the lessee. This mitigating provision seems to assume or anticipate that the lessee has defaulted to such an extent that Atel would terminate the lease and repossess the equipment and relet it. In that case, the net amount the defaulting party would ultimately lose, aside from anticipated residual value payments, would be the amount of payments for the months in which the equipment was in limbo between the default and the commencement of rental payments by the subsequent lessee, plus administrative costs. The rental payment provision thus begins to appear reasonable, and could be analogized to the landlord who is entitled to the remainder of rent due on a broken lease, less the rent paid during the lease term by a new tenant.

However, this still leaves the question of whether the inclusion of the anticipated residual value makes the liquidated damages provision a penalty. Plaintiff points to the legislative history preceding passage of the California Uniform Commercial Code section 10504, entitled "Liquidated Damages; Restitution," as follows:

> A liquidated damages formula that is common in leasing practice provides that the sum of lease payments past due, accelerated future lease payments, and the lessor's estimated residual interest, less the net proceeds of disposition (whether by sale or release) of the leased goods is the lessor's damages...

What plaintiff fails to recognize in this passage, however, is that estimated residual interest must be mitigated by return of the net proceeds of the disposition of the

---

9. Payment for equipment that has been destroyed is covered by paragraph 8 of the Lease, which incorporates a precise schedule of "Stipulated Loss Values." These values constitute a percentage of the actual cost of

the equipment, and continually decrease as the equipment ages. Interestingly, Atel now uses stipulated loss value, rather than anticipated residual value, as the measure of liquidated damages in its leasing contracts.

goods (which again assumes repossession of some sort). Thus, the legislature expressed the reasonableness in allowing the lessor to receive compensation for the lost value of its equipment, but not for double recovery in terms of lost value plus resale proceeds. The problem with the instant liquidated damages provision, is that according to the literal terms of the contract, the anticipated residual value operates without regard to the post-default status of the equipment, and whether that status (e.g. sale) brings the lessor any compensation.

Atel argues that there is no disproportionate or double recovery, because it does, in fact, mitigate its gain from the anticipated residual value payment by reimbursing or offsetting the amount of post-default renewal rent and/or equipment sales proceeds. (Pl's Exh. 18; CT 90, 95, 176) However, the Lease itself provides only for repayment to the defaulting party of rental proceeds from reletting, and makes no mention of reimbursement for proceeds from sale of the equipment.

Plaintiff's position again goes beyond the literal terms of the contract in the following passage from its post-trial briefing:

> [Quaker's] analysis … ignores what happens if Quaker Coal pays liquidated damages. It gets title to the equipment. In other words, ATEL achieves the benefit of its bargain, recovering its residual or reversionary interest, and Quaker Coal, perhaps involuntarily but of its own making, acquires title to the equipment. The burden of ownership was shifted contractually to the lessee under the Lease as a measure of damages as a consequence of defaults.

(Pl's Reply at 12) This is quite extraordinary, as the documents simply do not support such a contractual "shift" of ownership and payment.[10]

The Court recognizes that by the conclusion of trial plaintiff had subtracted its

equipment sales proceeds and renewal rent payments from the liquidated damages assessed against Quaker where such proceeds and rents have been received by Atel. Specifically, renewal rents were paid on certain of the trucks and wheel loader incorporated in Schedule 1, and all were resold, and the renewal and purchase were applied as an offset in plaintiff's current calculation of liquidated damages. (Pl's Exh. 18) If this were the only equipment involved, or if Atel had treated all equipment under the Lease in the same way, the Court would be faced with the question of whether to evaluate the case by limiting its analysis to the literal terms of the lease, or by expanding its analysis to the terms as applied in the particular facts presented.

However, the situation is not so simple. The remaining equipment under Schedules 7, 8, 9, and 10 does not appear to have been resold, and, with the exception of Schedule 8, plaintiff shows no renewal rents. (Pl's Exh. 18) Thus, for Schedules 7, 9, and 10 there is no offset to the sizable liquidated damages assessment (aside from nominal late charges).

The reason that there is no offset for the sale and/or renewal rent on much of the equipment is that Quaker continues to lease it. This is a situation that does not appear to be contemplated by the Lease, which quite clearly assumes that default and the application of the liquidated damages provision would be accompanied by Atel's termination of the Lease, taking possession of the equipment, and either reselling or reletting it, as discussed above. (CT 68 [anticipated residual value "presuppose[s] an orderly sale at the end of the lease"] ) By continuing to lease the equipment to Quaker, Atel continues to receive income from the equipment, but escapes the repayment or offset provisions of the Lease because continuing leasing by the

---

**10.** Indeed, the only mention of shifting ownership is Rider No. 2, which provides the *lessee* with the choice, "at its sole election," of whether to purchase the equipment, renew the lease, or terminate. (Pl's Exh. 1 at 22)

defaulting lessee was not anticipated. If one were to extrapolate from the resale and reletting provision of the Lease to the instant situation, then Atel would be required to repay or offset Quaker's continued rentals during the life of the equipment, thereby significantly reducing Atel's calculation of liquidated damages. Indeed, this appears to be what Atel plans to do. Again, this puts the Court in the position of having to distinguish between the Lease "as written" versus the Lease "as applied."

The point that comes to the fore from this examination is that by failing to anticipate at the time of contracting the situation that now exists—i.e. continuation of a significant portion of the Lease by Quaker—the parties agreed to a liquidated damages provision that, by its literal terms, entitles Atel to an amount grossly disproportionate to its actual damages. Thus, at the time of the formation of the contract, the amount of actual damages that could have been anticipated from the instant situation would have been *far* below the amount that results from the formula used in the Lease. Put another way, while it was foreseeable at the time of contracting that the lessee *might* miss a number of monthly payments and that both parties would desire to continue and/or to renew the lease, would it have been reasonable to impose on the lessee the full value of the equipment which it had never expressed any intention to own? The Court believes that such a drastic measure is disproportionate to the range of damages that reasonably could have

been anticipated. Since the focus provided by Civil Code section 1671(b) is on "the circumstances existing at the time the contract was made," the Court's focus must be on the terms of the contract "as written," which, as discussed above, are not reasonably proportional to the actual damages that could have been anticipated.[11]

Even if the Court were to judge the liquidated damages provision by Atel's professed practice of full mitigation of damages, i.e. "as applied" instead of "as written," Quaker would still be forced to pay a lump sum up front in the millions of dollars. Even though Quaker would then be entitled to retain possession of some of the equipment "rent-free" (CT 112–13), the financial burden of such payment would be extreme, and the Court does not believe that an imposition of liquidated damages of the size sought by plaintiff, even with mitigation, is reasonably related to Atel's actual damages as they could have been reasonably projected at the time of contracting.[12]

Taking a different tack, Atel argues that its actual damages cannot simply be viewed as compensation for delayed payment. Rather, Atel contends that "although it was a serious payment default, this was really more from the inception a credit default more than anything else, and the credit was really the issue that we were most concerned about, was their viability . . ." (CT 79, 112) As discussed above, the Court does not accept that the credit default occurred as an entirely distinct breach of contract. Thus, plaintiff is enti-

---

**11.** The Court does not mean to intimate or declare that Atel was wrong in repossessing some of the equipment while continuing to lease the remainder to Quaker. Those actions may have been in the best interests of both parties. The question remains, however, to what extent, if any, Atel has been damaged and whether liquidated damages are properly due.

**12.** Atel also argues that Quaker is a sophisticated business entity that willingly entered into the contract. However, " 'a principle of equity applicable to all contracts generally . . . is that a contract or provision, even if consis-

tent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or unconscionable.' " *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 925, 216 Cal.Rptr. 345, 702 P.2d 503 (1985) [citation omitted]; *H.S. Perlin Co., Inc. v. Morse Signal Devices of San Diego*, 209 Cal.App.3d 1289, 1301, 258 Cal. Rptr. 1 (1989) (the comments to the 1977 amendments suggest that, unlike the doctrine of unconscionability, an unreasonable risk allocation alone may invalidate a liquidated damages clause).

tled to no damages for the alleged credit default alone.

The Court recognizes, nonetheless, that Quaker's credit problems were a factor at the time of their late payment defaults, and that Atel was justifiably concerned about Quaker's financial viability. Even if the Court were to consider the credit default as a contributing element to the overall default, however, Atel never explains how to reasonably anticipate or ultimately calculate damages resulting from a credit default. All that Atel and its witnesses provide the Court is the conclusory argument that payment of full contractual liquidated damages would give Atel "the benefit of the bargain." However, the reasonableness standard built into section 1671(b), as further expressed by the California Supreme Court in *Ridgley*, surely demands more than this. Atel's failure to articulate its legal grounds for entitlement to full liquidated damages stemming from the alleged credit default is particularly troubling in light of the Court having specifically asked the parties at the end of trial to distinguish between a monetary and a credit default in their post-trial briefs. (CT 297) [13]

■ In conclusion, guided by Civil Code section 1671(b) and the interpretation and application of that statute by the California Supreme Court, this Court finds that defendant has met its burden of proving that the liquidated damages provision in Paragraph 9 of the Lease between Atel and Quaker was unreasonable under the circumstances existing at the time the contract was made. On that basis, the Court

rules that the liquidated damages provision shall not be enforced.[14]

In light of this judgment, the Court need not rule on defendant's motion in the alternative for judgment as a matter of law under Rule 52(c). The Court further denies plaintiff's request for an award of attorneys' fees and costs, and the Court denies defendant's request for sanctions.

### CONCLUSION

For the aforementioned reasons, and with good cause appearing, IT IS HEREBY ORDERED and ADJUDGED, pursuant to Federal Rules of Civil Procedure 54 and 58, that plaintiff's demand for liquidated damages is DENIED, and that JUDGMENT shall be entered in favor of Defendant Quaker Coal Company.

**IT IS SO ORDERED.**

---

[13] Atel's purported sense of the seriousness of the "credit default," and of its resulting damages, appears to be weakened by the testimony of its general counsel that, despite his opinion that Quaker continued to be in very bad financial straits, Atel chose not to repossess the equipment but rather to renew the leases on Schedules 8 and 10. (CT 112) Atel's explanation that this is being done "to attempt to reduce the lessee's costs" (CT 112, 213–14) as a form of mitigation is of questionable genuineness. For example, at other points in his testimony, general counsel stated that Quaker engaged in "a very serious default, and we at that point need to get out of the lease" (CT 208), and that "what we really want more than anything else is just to get out of the transaction, to be paid an amount that gave us the benefit of our bargain, and to walk away, and that's what we're seeking today." (CT 212) Moreover, the testimony shows that Atel made a choice to continue a relationship with Quaker when it had every legal right to terminate.

[14] Atel neither seeks, nor has it proven, entitlement to actual damages, which appear to have been paid close to, if not entirely, in full.